JIM JOHANSON, APPELLEE AND CROSS-APPELLANT, V.
THE BOARD OF EDUCATION OF LINCOLN COUNTY SCHOOL
DISTRICT NO. 1, ALSO KNOWN AS NORTH PLATTE PUBLIC
SCHOOLS, A POLITICAL SUBDIVISION OF THE STATE OF NEBRASKA,
AND LINCOLN COUNTY SCHOOL DISTRICT NO. 1, ALSO KNOWN
AS NORTH PLATTE PUBLIC SCHOOLS, A POLITICAL SUBDIVISION
OF THE STATE OF NEBRASKA, APPELLANTS AND CROSS-APPELLEES.
589 N.W.2d 815

Filed February 19, 1999.    No. S-97-1125.

Kelley Baker, of Harding, Shultz & Downs, for appellants.

Jerold V. Fennell, of Domina Law, P.C., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

The appellants, Lincoln County School District No. 1 and its board of education (collectively District), terminated the employment contract of the appellee, Jim Johanson, with the District, finding that Johanson had engaged in unprofessional conduct. Johanson filed a petition in error with the district court, which concluded that there was insufficient evidence to support the findings of the District. We conclude that the evidence was sufficient to support the District's findings, and therefore, we reverse the order of the district court and remand the cause with directions to reinstate the District's decision.

## I. BACKGROUND

### 1. SECTION 79-831 NOTICE

Johanson was employed by the District and taught fifth grade at Osgood Elementary. Johanson received written notice pursuant to Neb. Rev. Stat. § 79-831 (Reissue 1996) that the interim superintendent would be submitting a recommendation to terminate Johanson's contract of employment with the District effective May 30, 1997. The § 79-831 notice stated that Johanson had the right to request a hearing and that such a request must be received no later than 7 days after receipt of the notice by Johanson; that if Johanson requested a hearing, such would be scheduled within 30 days; that Johanson would be notified in writing at least 5 days prior to any such hearing as to the hearing's date, time, and place, together with the grounds alleged for termination; and that Johanson would receive notification of his rights relative to legal representation, access to evidence, examination of witnesses, right of appeal, and other pertinent information.

Johanson requested a hearing on the matter, as well as a complete listing of all the alleged grounds for the termination of his employment, a complete list of witnesses who would testify at the hearing, a summary of what such witnesses would testify to, and copies of all the documents that would be presented at the hearing or used as a basis for any witness' testimony. The District responded by providing Johanson with written notice, pursuant to Neb. Rev. Stat. § 79-832 (Reissue 1996).

## 2. SECTION 79-832 NOTICE

The § 79-832 notice stated the grounds alleged by the District in support of the recommendation to terminate Johanson's contract, provided the names of the witnesses who would be called to testify, identified the documents that would be offered as exhibits, and described Johanson's right to be represented and the opportunities he would be afforded at the hearing. An affidavit of Paul R. Brochtrup, the interim superintendent, was enclosed with the § 79-832 notice and summarized the allegations against Johanson.

The alleged grounds for termination contained in the § 79-832 notice involved incidences of alleged unprofessional conduct toward two of Johanson's students, Jacob M. and Craig L. The § 79-832 notice stated that Johanson had allowed the fifth grade class to hide from Jacob, had tied Jacob up with an extension cord, had referred to Jacob as an "idiot," and had physically and verbally abused Craig. Brochtrup's affidavit specifically alleged the following: (1) During the fall of 1995, while Jacob was in the restroom, Johanson allowed the fifth grade class to leave the classroom and hide from Jacob; (2) Johanson wrapped Jacob in an electrical cord as a joke; (3) Johanson made a fist and used his knuckles to hit the center of Craig's forehead; (4) Johanson took Craig from the classroom into the hall, put his hands on Craig's cheeks, and shook Craig's head "real hard"; (5) Johanson took Craig to the door that separates the fourth and fifth grade classrooms, opened the door, and told Craig to look at the fourth graders, who would be his classmates next year if Craig did not "get to working"; (6) Johanson lifted Craig up by his jaw and pushed his cheeks until Craig's teeth hurt; (7) Johanson grabbed Craig by the shoulders

and shook him; (8) Johanson cornered Craig in the fifth grade classroom "with his hands on [Craig's] cheeks"; (9) Johanson asked Craig to stick out his tongue, Johanson placed a drop of soap on his finger, and then Johanson placed the soap on Craig's tongue; and (10) Johanson gave Craig a paper sack and told Craig to pack and get out.

### 3. HEARING

Jacob is diabetic, suffers from attention deficit hyperactivity disorder, and has a learning disability. Craig also has a learning disability, suffers from attention deficit hyperactivity disorder, and has a pervasive developmental disorder.

Jacob's mother and Craig's mother both testified on behalf of the District.

The secretary at Osgood Elementary, Monna Trueblood, testified as to the incident involving Jacob and the electrical cord. Trueblood stated that Jacob came to the office and asked to use the telephone. She asked Jacob why he wanted to use the telephone, and Jacob replied that he wanted to call his mother to untie him. When Trueblood looked up, she noticed that Jacob was "tied up" with "a heavy extension cord." She untied Jacob and asked him who had tied him up. Jacob told her that it was "Mr. J." Trueblood stated that the extension cord was about 25 feet long and was wrapped around Jacob between his elbows and his shoulders. On cross-examination, Trueblood testified that there were no knots in the cord, but it was wrapped in a "mummy fashion," was not "dangling," and was "maybe secured in back." Trueblood testified that Jacob was unable to lift his arms, but that he did not "exhibit any physical discomfort." She stated that Jacob "did not seem exceptionally upset."

Jamalee O'Rourke, a fourth grade teacher at Osgood Elementary, testified as to the incident concerning Craig and the fourth grade class. O'Rourke stated that the door between her classroom and Johanson's classroom opened and that Johanson brought Craig into her classroom. According to O'Rourke, Johanson said, "I want you to look at this class. Look at this class, because if you don't get to work you're going to be with these students next year." Johanson stated this "a couple of times." She acknowledged that this was not "typical behavior" and that it "surprised" her.

Jackie Kelsey, an elementary behavioral consultant, testified as to various incidents concerning Craig. Craig had told her about the incident involving the fourth grade classroom and that it had embarrassed him; that Johanson had hit Craig in the forehead with Johanson's knuckles, causing Craig's glasses to fall down on his face, and that it had hurt; that Johanson had put his hands on Craig's cheeks and shaken Craig's head very hard and that this also hurt; and that Johanson had picked up Craig by his jaw, which pushed his cheeks into his teeth until his teeth hurt. According to Kelsey, Craig indicated that he did not want Kelsey to tell the principal or Johanson about his disclosing these incidents.

Tana Ambrose, a resource teacher at Osgood Elementary, testified as to Johanson's physical handling of Craig. Ambrose testified that she had gone to Johanson's classroom and that when she turned from the hall into the classroom she saw that Johanson had his hands on Craig's face along the jawline. Johanson was telling Craig that Johanson did not want Craig to use "those words in his classroom." Ambrose described Johanson's tone of voice as angry. Ambrose stated that as Johanson "was talking he was kind of moving his hands trying to reinforce what he's [sic] saying . . . I saw Craig from the sideview, and his glasses—I didn't see them moving, so I don't think—he was not shaking him hard." Johanson did not appear to be emotionally out of control, and Craig did not seem to be in any physical pain.

Jeanelle Cross, an aide to behaviorally disturbed students at Osgood Elementary, testified as to another incident where Johanson physically handled Craig. Cross stated that she had walked into Johanson's classroom and observed Johanson shaking Craig by the shoulders. Johanson's back was to Cross, and he was apparently unaware of her presence. According to Cross, Johanson was "shaking [Craig] pretty good," since she saw Craig's "glasses bobbling." Cross stated that she did not remember what was said, but that Johanson's voice was raised. Cross stated that she was "shocked" by Johanson's behavior and that the other students' "eyes were real wide."

Cross also observed the incident concerning the paper sack. According to Cross, Craig started "making some noises" when

she told him she was taking him to music class. When Johanson overheard this, he said,

> Craig, I don't know why you do these things to make me angry. I think the only thing that works with you to make you behave is to get angry with you. If you don't like the rules in this school, then just pack your stuff up, get out, check yourself into a new school and no one here will miss you.

Craig stood there, so Johanson asked Craig if he needed a paper sack to put his "stuff" in. Craig said, "[O]kay," so Cross helped Craig clean out his desk and escorted him to the office.

The principal of Osgood Elementary, Dick Deutschman, testified at length about the allegations against Johanson. Deutschman stated that he had been told by two fifth grade students that the class hid from Jacob on the playground while Jacob was in the restroom. When Jacob emerged from the restroom, Jacob had no idea where his classmates had gone. Deutschman discussed the incident with Johanson, and Johanson stated that it was something the children wanted to do to one another.

When Deutschman learned of Johanson's tying Jacob in an extension cord, he asked Johanson to apologize to Jacob's parents, and Johanson did so.

Deutschman stated that the story concerning Johanson's alleged statement that Jacob was an "idiot" "didn't make a lot of sense," and so, he "didn't do a lot with that." Deutschman testified in some detail about the incident in which Johanson put soap on Craig's tongue. According to Deutschman, Johanson acknowledged that Johanson's behavior was inappropriate. Johanson told Deutschman that he had apologized to Craig's parents.

When Deutschman learned of the paper sack incident, he began to investigate Johanson. During this investigation, Deutschman was told by some fifth grade students that Johanson had jerked and shaken Craig and that Craig had been picked up by his neck.

On cross-examination, Deutschman admitted that Johanson's evaluations had been positive. Deutschman stated that his last

evaluation of Johanson was completed only 1 day prior to the date of the § 79-831 notice and that this final evaluation was "average." Deutschman also admitted that he had been accused by Craig's parents of attempting to conceal information concerning Johanson, but denied that he had done so. Deutschman admitted that he had "sided with Mr. Johanson" concerning the extension cord and soap incidents.

Johanson testified on his own behalf. Johanson admitted that his class had hidden from Jacob while Jacob was in the restroom. According to Johanson, he and the other students hid in the music room and, when Jacob came back into the music room, they jumped out and said, "[S]urprise." On cross-examination, Johanson stated that he did not perform this "joke" on any of his other students.

Johanson also admitted to having wrapped Jacob in an extension cord. Johanson gave the following account:

> It was in the afternoon, I was teaching a lesson using some electric burners that I had, and I had to drop cords out to teach that lesson; and the lesson was over and we were cleaning up the room, and Jacob came up and asked me what I was doing, and I said that I was wrapping up dropped [sic] cords and he asked—and I asked if he would like to help and he said he would.
>
> And I handed him the end of the drop cord and I said, "Now spin around in a circle," and he spun around in a circle and let the cord wrap around him; and—he was kind of dancing and kind of showing off a little bit, enjoying the attention that he was getting from that. And—and then when he—when it was wrapped around him, he kind of, I don't know, reacted and ran out of the classroom.
>
> And my intent there was just to lift the cord up off of him, much like I had been wrapping them around my arm and shoulder as I was putting them away. I guess I was doing it to kind of build their—to bolster the self-esteem. I didn't mean to do that to destroy him.

On cross-examination, Johanson admitted that he was aware Jacob was upset when Jacob ran from the room and that Jacob was going to call his mother.

Johanson denied making a fist and hitting Craig in the fore-head with his knuckles. Johanson stated that he did not know of any basis for this allegation.

Johanson admitted to handling Craig by placing his hands on Craig's jaw. Johanson gave the following account:

> I did put my hand underneath Craig's chin and turned his face to look at me . . . . Craig walked up to me and said, "How in the hell do you expect me to do these papers if you don't put them in my bag?"
>
> And I just put my hand underneath his chin and said, "Young man, that is not the way you talk to an adult," and that was done between the third and the fourth grade room, and it was done in front of Mr. Deutschman. He observed that incident.

According to Johanson, he did not shake Craig's head hard.

Johanson admitted to the incident involving the fourth grade class. Johanson stated that he told Craig, "Young man, this is the—the people that you're going to be in class with next year. Is this the ones you want to be with or do you want to be with your group that you're in?" Johanson admitted that he did not handle this incident as well as he could have.

Johanson denied picking Craig up by Craig's jaw. Johanson stated that he knew of no basis for this allegation. Johanson also denied shaking Craig. Johanson thought that this allegation arose from an incident concerning some scissors with which Craig attempted to stab Johanson. Johanson testified that during the struggle to take the scissors from Craig's hand, Craig's glasses "did become bumped or crooked on his face." On cross-examination, Johanson stated that he first removed the scissors from Craig's hand and then held Craig to control him. The scissors were actually on the desk when he was holding Craig.

Johanson admitted to turning Craig's head so that Craig would look at him, on another occasion, which was the basis for the allegation of cornering Craig in the classroom.

Johanson gave the following account of the soap incident:

> [Craig] said, "I'm going to take these scissors and cut the nipples off all the girls in this class." And that's when I said, "Craig, that is not appropriate and you're not going to use that language in this classroom." I said, "Do you

want to stop using it or do you want me to wash your mouth out with soap," again thinking that he would take—that he would just stop.

[Craig] said, "I will—I want you to wash my mouth out with soap," and so I said, "Then come up here." And I took . . . the bottle, I put it—a drop on my finger. I asked him to stick his tongue out. I placed one—I placed—just touched it to his tongue, and that was basically the end of the incident.

Johanson admitted to telling Craig's parents that he "was in error" and that Craig's behavior was "no excuse" for his own behavior.

Finally, Johanson admitted to the incident involving the paper sack. He stated that he "should've handled [the incident] differently."

#### 4. UNPROFESSIONAL CONDUCT

Testimony was adduced and exhibits received as to whether Johanson's conduct was unprofessional. A section of the District's teacher handbook concerning discipline was entered into evidence, as well as a section of the District's policy manual, which also concerned discipline. Brochtrup stated that the teacher handbook was provided to every teacher in the District and that, although the policy manual was not provided to individual teachers, the policy manual was available for review in every school building. The teacher handbook stated in pertinent part:

The teacher should be fair, reasonable, dignified and approach pupils in good temper. Loud, angry talk, and sarcasm employed by a teacher in the presence of his class is apt only to lessen the respect of all the students for him and antagonize the offender.

Courtesy should be practiced at all times by both teacher and student. Many bad conduct cases will disappear if the teacher is courteous to students and demands equal consideration from students.

. . . .

The suggested steps of procedure in handling problems of pupils by teacher are:

Know student's background.

Handle promptly in a private conference.

Write a report to the building principal, giving background of the case and steps taken.

Conference with student and principal.

Conference with student, principal, and parents.

Strong disciplinary measures or suspension by the principal.

Principals are authorized to suspend any student from school for gross misdemeanors, immortality [sic], persistent disobedience or violation of the rules or policies of the school, or when the presence of the student is detrimental to the best interests of the school.

Most of the language contained in the teacher handbook was also contained in the policy manual. However, the policy manual also stated: "Teachers will not use physical means to inflict punishment or compel obedience. . . . A teacher or principal may use physical force against a pupil, without prior consent, because of unusual circumstances, when immediate action is essential to repel an attack, or protect other persons." Both the teacher handbook and the policy manual explicitly prohibited the use of corporal punishment.

Based on his review of the facts and the above documents, Brochtrup stated that it was his professional opinion that Johanson's behavior toward Jacob and Craig was "unbecoming of a professional educator and constitute[d] unprofessional conduct." Brochtrup also stated that teachers dealing with students with special needs should meet a higher standard of professionalism.

When Johanson was asked whether his handling of the hiding and electrical cord incidents involving Jacob was professional, Johanson stated, "I think humor's important in the classroom, but I guess it's probably not professional." Johanson also admitted that he had "anguished" over the soap incident and that he had "really screwed up."

## 5. DISTRICT FINDINGS

The District found that Johanson's conduct toward Craig and Jacob was unprofessional. The District specifically found

that the following conduct was unprofessional and largely undisputed:

> allowing the fifth grade students to hide from [Jacob] while he was in the rest room; tying, or allowing Jacob to wrap himself up with an electrical cord; taking Craig to the door that separates the fourth and fifth grade classrooms, opening that door, and telling Craig "Look at these kids because they will be your classmates next year if you don't get to working."; placing soap on Craig 's tongue; and giving Craig a paper bag and telling him to pack his things and get out of the classroom.

Although there was conflicting testimony, the District further found that Johanson had "used physical force or restraint when the need for physical force either did not exist or had ended." Finally, the District found that Johanson's conduct was contrary to state law as well as the disciplinary procedures contained in the teacher handbook, the District's policies, and the District's rules and regulations. Accordingly, the District terminated Johanson's contract effective at the end of the current contract period.

In a lengthy order, the district court concluded that there was insufficient evidence to support the District's findings.

## II. ASSIGNMENTS OF ERROR

The District asserts, restated, that the trial court erred in holding that the court would have been required to direct a verdict based on the lack of evidence if the matter had been tried to a jury. On cross-appeal, Johanson asserts that he was denied procedural due process, in violation of § 79-832, the Nebraska Constitution, and the Constitution of the United States.

## III. SCOPE OF REVIEW

The standard of review in a proceeding in error from an order of a school board subjecting a teacher to disciplinary action is whether the school board acted within its jurisdiction and whether there is sufficient evidence as a matter of law to support its decision. The evidence is sufficient as a matter of law if a judge could not, were the trial to a jury, direct a verdict. *Daily v. Board of Ed. of Morrill Cty., ante* p. 73, 588 N.W.2d 813 (1999).

## IV. ANALYSIS

### 1. CROSS-APPEAL

Johanson argues that he was denied procedural due process, in violation of § 79-832, the Nebraska Constitution, and the Constitution of the United States. Johanson contends his due process rights were violated in that he was not provided with a summary of the nature of the testimony of every witness that testified against him and that hearsay testimony was admitted over objection.

#### (a) Nature of Witness' Testimony

In *Irwin v. Board of Ed. of Sch. Dist. No. 25*, 215 Neb. 794, 340 N.W.2d 877 (1983), this court addressed the constitutional requirements of procedural due process in the contested termination of a tenured teacher. Quoting the Fifth Circuit, we stated:

> "Within the matrix of the particular circumstances present when a teacher who is to be terminated for cause opposes his termination, minimum procedural due process requires that: (a) [the teacher] be advised of the cause or causes for his termination in sufficient detail to fairly enable him to show any error that may exist, (b) he be advised of the names and the nature of the testimony of witnesses against him, (c) at a reasonable time after such advice he must be accorded a meaningful opportunity to be heard in his own defense, (d) that hearing should be before a tribunal that both possesses some academic expertise and has an apparent impartiality toward the charges."

*Id.* at 796-97, 340 N.W.2d at 879, quoting *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970).

The constitutional due process requirements set forth in *Irwin* were later applied in *Benton v. Board of Ed. of Sch. Dist. No. 17*, 219 Neb. 134, 361 N.W.2d 515 (1985), and *Eshom v. Board of Ed. of Sch. Dist. No. 54*, 219 Neb. 467, 364 N.W.2d 7 (1985). In *Benton*, the notice did not provide the factual allegations underlying the charges against a school principal, but, rather, offered only the " 'just cause' " reasons for considering termination in the conclusory language of the applicable statute. *Id.* at 137, 361 N.W.2d at 518. We held that the notice failed to afford the principal constitutional due process. *Id.* In *Eshom*, we

held that a principal's reference to informal evaluations of a teacher, the nature of which testimony was not disclosed in the notice, did not violate due process. Thus, although *Benton* clearly indicates that notice of the cause or causes for termination must be presented in some detail, *Eshom* indicates that the nature of each witness' testimony need not be presented in exacting detail.

In *Wells v. Dallas Independent School Dist.*, 793 F.2d 679 (5th Cir. 1986), which was decided after both *Benson* and *Eshom*, the Fifth Circuit limited the language in *Ferguson v. Thomas, supra*, the case upon which this court originally relied in *Irwin*. In *Wells*, the question was whether a school superintendent's constitutional due process rights were violated when a termination hearing was held without the superintendent's having previously received a list of witnesses and a summary of those witnesses' testimony. The court held that there was no due process violation, stating:

> When an administrative termination hearing is required, federal constitutional due process demands either an opportunity for the person charged to confront the witnesses against him and to hear their testimony or a reasonable substitute for that opportunity. One who is present, who sees and hears the witnesses against him, has notice of who they are and what they maintain before he must meet them with his case; his confrontation rights are satisfied. It is only when he was not present when they were heard that such measures are called for as [a notice containing a summary of each witness' testimony]. When, as here, the adjudicator acts on the sole basis of testimony produced at a hearing at which the accused is present, then by the time the accused must present his case he has necessarily already heard the witnesses' names and the substance of their testimony. The authorities upon which [the superintendent] relies to demand names and summaries of testimony in advance plus confrontation are cases in which there was no confrontation and we required the other as a substitute. *Dixon* [*v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir.1961)]; *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir.1970). Any charged person is constitu-

tionally entitled once to be told what he is charged with and on what evidence; none is entitled to be told so twice. To so require would be to impose on state administrative proceedings a higher standard than the Constitution requires for criminal trials. . . . This we have never done.

(Emphasis omitted.) (Citations omitted.) *Wells v. Dallas Independent School Dist.*, 793 F.2d at 683.

In the instant case, Johanson was present at the hearing. Based on *Wells v. Dallas Independent School Dist., supra*, and our own holding in *Eshom*, we can only conclude that Johanson was not constitutionally entitled to a summary of the nature of the testimony of the witnesses against him.

Johanson was likewise not entitled to such by statute. The proceedings in the instant case were brought pursuant to Neb. Rev. Stat. §§ 79-829 to 79-832 (Reissue 1996). Section 79-832(1) states:

A formal due process hearing . . . means a hearing procedure adopted by the school board which contains at least the following: (a) Notification to the certificated employee in writing at least five days prior to the hearing of the grounds alleged for action, cancellation, termination, or nonrenewal of the teacher's contract; (b) upon request of the certificated employee a notification, at least five days prior to the hearing, of the names of any witnesses who will be called to testify against the certificated employee and an opportunity to examine any documents that will be presented at the hearing; (c) the right to be represented; and (d) an opportunity to cross-examine all witnesses and to examine all documents and to present evidence material to the issues.

Statutory language is to be given its plain and ordinary meaning. *Hilliard v. Robertson*, 253 Neb. 232, 570 N.W.2d 180 (1997). Although § 79-832 provides for a list of witnesses upon request, it does not require the District to provide a summary of the nature of the witnesses' testimony.

### (b) Admission of Hearsay Testimony

The strict rules of evidence obviously did not apply at Johanson's hearing. See, *Daily v. Board of Ed. of Morrill Cty., ante* p. 73, 588 N.W.2d 813 (1999); *Hollingsworth v. Board of*

*Education,* 208 Neb. 350, 303 N.W.2d 506 (1981). Nonetheless, Johanson claims that his due process rights were violated because some hearsay testimony was admitted at his hearing, citing *Hollingsworth v. Board of Education, supra.* In *Hollingsworth,* we stated: "Although strict adherence to the rules of evidence cannot be demanded or even expected at a hearing before a school board, when a teacher's career hangs in the balance, the basic principles of due process demand that hearsay statements of students be given little, if any, weight." *Id.* at 360, 303 N.W.2d at 512. Nowhere in this statement is there any indication that the *admission* of hearsay testimony at such a hearing violates due process. Rather, the statement clearly indicates the opposite. Not only may hearsay testimony be admitted at such a hearing, but it also may be given some weight, albeit little, if any.

Because hearsay testimony may be properly admitted at a hearing to terminate a tenured teacher's contract, we can only conclude that Johanson's assignment of error in this regard is without merit.

### 2. SUFFICIENCY OF EVIDENCE

In the instant case, the trial court concluded that there was insufficient evidence to support the District's findings that Johanson's conduct was unprofessional. Thus, the question is whether there was sufficient evidence presented to support the District's finding that Johanson's conduct was unprofessional.

We recently defined unprofessional conduct as "that conduct which breaches the rules or ethical code of a profession or conduct which is unbecoming a member in good standing of a profession." *Daily v. Board of Ed. of Morrill Cty., ante* at 90, 588 N.W.2d at 824.

In the instant case, there was sufficient evidence to conclude that the teacher handbook and the policy manual were part of the rules or ethical code governing teachers in the District. The teacher handbook was provided to every teacher in the District, and the policy manual was readily available. Accordingly, we will look to the relevant provisions of the teacher handbook and the policy manual to aid us in our analysis of the District's findings concerning unprofessional conduct.

However, we note that the teacher handbook and the policy manual do not define the boundaries of unprofessional conduct in the instant case. Conduct may be deemed unprofessional even if it does not specifically violate the rules or ethical code governing the professional at issue, since such conduct may still be unbecoming of a member in good standing of the teaching profession. See *Daily v. Board of Ed. of Morrill Cty., supra.* See, also, *Boss v. Fillmore Cty. Sch. Dist. No. 19*, 251 Neb. 669, 559 N.W.2d 448 (1997) (Gerrard, J., dissenting). To determine whether conduct is unbecoming, even though not in violation of an explicit rule or ethical code, we look to the opinions of educational professionals. In "light of their professional expertise, schoolteachers are normally expected to be able to determine the type of conduct which constitutes unfitness to teach." *Shea v. Board of Medical Examiners*, 81 Cal. App. 3d 564, 576, 146 Cal. Rptr. 653, 660 (1978), citing *Morrison v. State Board of Education*, 1 Cal. 3d 214, 461 P.2d 375, 82 Cal. Rptr. 175 (1969). See, also, *Sanders v. Board of Education*, 200 Neb. 282, 263 N.W.2d 461 (1978).

### (a) Hiding Incident

The evidence regarding the occurrence of this incident was not in dispute. Johanson admitted to hiding from Jacob while Jacob was in the restroom and that this was not done to any other students. Not only did Johanson admit that this incident occurred, but he, as an educational professional, also admitted that it constituted unprofessional conduct. Accordingly, we conclude that there was sufficient evidence to support a finding that this conduct was unbecoming a member in good standing of the teaching profession and, thus, the District's finding that it was unprofessional.

### (b) Electrical Cord Incident

Likewise, the evidence regarding the occurrence of this incident was not in dispute, and Johanson admitted that his conduct in this regard was unprofessional. We again conclude that the evidence was sufficient to support a finding that Johanson's conduct was unbecoming of a teacher and, thus, was unprofessional.

### (c) Fourth Grade Class Incident

Once again, there is no dispute as to whether this incident occurred. The question is whether it constituted unprofessional conduct.

The teacher handbook states that teachers should act dignified toward students and should not employ sarcasm. The steps of procedure in handling discipline problems suggested in the handbook include knowing the student's background, handling the problem promptly in a *private* conference, and then providing the principal with a written report. Nowhere does the handbook or policy manual suggest that a teacher *publicly* humiliate a student in front of another classroom, which, if not sarcastic, is certainly undignified. O'Rourke, the fourth grade teacher who witnessed this incident, stated that it surprised her, and Johanson admitted that he did not handle this incident as well as he could have.

We conclude that the evidence was sufficient to support a finding that Johanson's conduct breached the rules or ethical code of the District and, thus, that there was sufficient evidence to support the District's finding that it was unprofessional.

### (d) Soap Incident

That this incident occurred is not in dispute. Again, the question is whether it was unprofessional.

The policy manual governing Johanson's conduct explicitly prohibits "physical means to inflict punishment or compel obedience" absent "unusual circumstances, when immediate action is essential to repel [an] attack, or protect other persons." Regardless of whether placing soap on Craig's tongue was "corporal punishment," a matter we need not decide, it was clearly a "physical means" of discipline. There is no evidence that using such means was essential, or even remotely necessary, to get Craig to stop using foul language, let alone to repel an attack or protect other persons. Johanson asked Craig whether he wanted his mouth washed out with soap, and Craig willingly complied, going so far as to stick his tongue out. The only inference one can draw from Craig's complicity, at least in regard to the issue at hand, is that physical means were not necessary to compel Craig's obedience in any way. Moreover, Johanson him-

self admitted that his conduct "was in error" and that Craig's behavior did not excuse his own.

We conclude that the evidence was more than sufficient to support the District's findings that Johanson's conduct regarding this incident was unprofessional.

### (e) Incidents of Physical Force or Restraint

The evidence regarding Johanson's use of physical force or restraint, other than the electrical cord and soap incidents, was largely in dispute. In analyzing these incidents, we bear in mind that, under the directed verdict standard, the District is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be drawn from the evidence. See *Alexander v. Warehouse*, 253 Neb. 153, 568 N.W.2d 892 (1997). Kelsey's testimony was based entirely upon statements made to her by Craig. Thus, even under the directed verdict standard, her testimony should be given little, if any, weight. See *Hollingsworth v. Board of Education*, 208 Neb. 350, 303 N.W.2d 506 (1981). However, Ambrose testified that she had personally witnessed Johanson holding Craig by the jawline and moving Craig's head from side to side to reinforce what he was saying. She also stated that Johanson was speaking in an angry voice. Cross testified that she personally observed Johanson shaking Craig by the shoulders hard enough to make Craig's glasses bobble and that Johanson's voice was raised.

The above incidents are clearly contrary to the rules or ethical code of the District. First, the teacher handbook discourages loud, angry talk. Second, in neither instance of physical discipline is there any indication that such was immediately essential to repel an attack or protect other persons. Under the policy manual, physical contact is not a permissible means to reinforce what one is saying. As for the incident observed by Cross, Johanson admitted that, although Craig may have had scissors at one point, the scissors were on the desk while Johanson was shaking Craig.

We can conclude only that the evidence was sufficient to support the District's findings that Johanson's use of physical force or restraint constituted unprofessional conduct.

## V. CONCLUSION

We conclude that Johanson's due process rights were not violated. We further conclude that the District's findings as to the incidents discussed in the analysis are supported by sufficient evidence and are sufficient to support Johanson's contract termination. Therefore, we need not discuss any additional findings of the District or conclusions of the district court. We reverse the district court's order and remand the cause with directions to reinstate the District's decision.

REVERSED AND REMANDED WITH DIRECTIONS.