IN RE INTEREST OF AARON D., A CHILD
UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V.
LORENA D., APPELLANT.
691 N.W.2d 164

Filed January 28, 2005.   No. S-04-590.

Richard Register and Christina C. Boydston for appellant.

Jeri L. Grachek, Deputy Dodge County Attorney, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

Aaron D. was removed from the residence of his mother, Lorena D., on May 20, 2002, following a report that he had inappropriately touched his younger sister, Carmen S. The State petitioned to terminate Lorena's parental rights on October 22, 2003, on the sole ground that Aaron had been in out-of-home placement for 15 or more months of the most recent 22 months. See Neb. Rev. Stat. § 43-292(7) (Reissue 2004). The county court, sitting as a juvenile court, terminated Lorena's parental rights, and she appeals.

## BACKGROUND

Aaron was born on August 12, 1994, and was 9 years old at the time of trial. Aaron had first been removed by law enforcement from Lorena's residence in Fremont, Nebraska, on October 22, 1998, because of some bruises reported on Aaron's older brother,

Irving D., but was out of the home only until December 9. However, the Department of Health and Human Services (the Department) continued to monitor the family. Irving was 7 years old at the time and had been diagnosed with Duchenne's muscular dystrophy, making him a special needs child. In August 2001, Irving was placed in a group home because of Lorena's difficulties in meeting his needs. Irving remained in this placement at the time of trial because of his medical needs; Irving's disposition and Lorena's parental rights with respect to Irving are not at issue in this appeal. The record reflects that Aaron has three younger siblings, including Carmen, whose respective dispositions are not at issue in this proceeding. The parental rights of Aaron's father have also been terminated and are not at issue in this appeal.

Lorena testified in her own behalf, through an interpreter. Lorena testified that she had completed her education in Mexico and had tried to learn English in the United States, but "it doesn't stick." Lorena testified that Aaron was born in Mexico but that she brought Aaron to the United States with Irving because she was seeking better medical care for Irving. Irving's condition could be fatal at an early age. Lorena's immigration status is not relevant to our analysis of this appeal, except insofar as it has affected her ability to obtain transportation and employment.

The Department increased family support services to Lorena in January 2002 due to Aaron's inappropriate behaviors and Lorena's inability to control them. The State adduced testimony from Nancy Wright, a protection and safety worker for the Department. Wright was the caseworker for Aaron and Irving. Wright testified that Aaron's behaviors included running away from his house, stealing bicycles from school, and physical aggression toward other children at school and that Lorena had been unable to control those behaviors. Lorena testified that Aaron had been a "good kid" but that his behavior had changed. Lorena said that Aaron's behavior had changed as Irving's health deteriorated and that Aaron became jealous when Lorena gave birth to Carmen on December 2, 1998. Lorena testified that Aaron's behavior again became worse after Irving left the home, explaining that " '[h]e became more — like I don't know, maybe he wanted to let people know — or wanted to let it be known how he was feeling because his brother had left.' "

Aaron was again removed from Lorena's home on May 20, 2002, by law enforcement, immediately after a report that Aaron had inappropriately touched Carmen. Lorena testified that when Carmen was about 3 years old and Aaron was about 7 years old, Carmen reported that Aaron had, with his finger, touched her "colita," which can mean "rear end," but which Lorena understood to refer to Carmen's genitals. Carmen had clothes on at the time. Lorena said that she told Aaron that Carmen was his sister; that he needed to protect her, not harm her; and that if Carmen was touched again, Lorena would have to call the police. Lorena also testified that after the incident, she paid more attention to what Aaron and Carmen were doing. Lorena did not report this incident to anyone from the Department, but about 2 weeks later, Carmen told the family support worker. Lorena testified that she was not given a chance to explain what she had done in response to the incident and that " '[t]hey didn't let me say anything. They just came and took him and that was that.' "

Aaron was adjudicated on July 10, 2002, pursuant to Neb. Rev. Stat. § 43-247(3)(b) (Cum. Supp. 2002). No appeal was taken from the adjudication. Aaron was initially placed in treatment foster care, which involves constant evaluation and psychological or psychiatric care. Aaron was then placed in agency-based foster care, which is intended to respond to children with more severe behavioral problems by providing foster parents with an agency that provides additional training and support. Wright testified that Aaron's behaviors had improved by the time of trial and that while he still had occasions of "acting out" in school, his behavior was not as violent, consisting more of attention-seeking rather than assault. Lorena testified that according to the Department, Aaron's behavior became worse after he had been removed from her home, but that she did not see that behavior during visits.

After Aaron's adjudication, the Department developed case plans for Lorena. No appeals were taken from any dispositional orders. Wright testified that Lorena's case plans had included two general goals: to provide a safe and appropriate living environment for herself and her children, and to parent her children in an effective and appropriate manner. The goal of providing a safe environment included finding and maintaining appropriate

housing, with which Wright testified Lorena had some difficulty, having been evicted from her residence twice during Wright's management of the case. Lorena was also expected to obtain and maintain sufficient employment to financially support her family, which goal Wright said Lorena was also unable to consistently achieve. Lorena said she was unable to obtain consistent employment because of her immigration status.

Lorena received food stamps, Medicaid, and assistance with her utility bills. The case plan required Lorena to prepare a household budget, which she was unable to do. Lorena had been providing a residence for the family by living with her boyfriend, Rigoberto S. (Rigo), who paid the rent and bills and provided food and clothing for Lorena and her children. Rigo and Lorena had lived together for 6 years, and he was the father of her two youngest children. Wright testified that Rigo had, at the time of trial, been incarcerated for 6 to 7 months, but Lorena testified that Rigo had been deported to Mexico. Lorena testified she was paying the rent with the help of welfare and by selling " 'noodle and tamales' " to other Hispanic families.

Lorena's second goal of effective parenting included identification and elimination of risk conditions or behaviors in her home, including domestic violence issues and single parenting issues. According to Wright, Lorena was to learn and consistently implement age-appropriate and effective discipline and communication skills, develop household rules, and obtain materials to educate herself about child growth and development. Wright testified that there had been an incident in which Rigo had pushed Lorena, and Lorena had broken a beer bottle over his head, cutting him. Rigo was apparently arrested and incarcerated on August 26, 2003; his charges, according to the Department's report, included "Failure to Appear—Driving under Suspension, No Proof of Insurance; Fugitive from Justice/Failure to Pay Costs/Fines—DUI (Douglas County); and Fugitive from Justice/Failure to Appear—DUI 3rd (Platte County)." The record suggests that Rigo had a problem with alcohol prior to his incarceration.

Wright testified that Lorena had been asked to see a therapist, but that Lorena had never sought an authorization from the Department to see a particular provider. Wright said, however, that Lorena might have seen Maria Goede, who had been the

therapist for the family and the individual therapist for Irving and Aaron. Wright testified that the Department's family support worker had tried to provide Lorena with classes or instruction on parenting skills, but that despite "all of her attempts to work on parenting education and parenting skills, Lorena just did not seem to be interested in [working on those skills] at the time." Lorena testified that her first family support worker had been helpful to her in learning parenting skills, but that the replacement family support worker had not been helpful. Lorena also testified that the Department had tried to get her to take parenting classes in Sioux City, a considerable distance from Fremont, despite her lack of reliable transportation. Wright stated that Lorena had reported, in May 2003, that she was going to work with Goede on parenting skills, but had not yet started. Lorena testified that she met with Goede for counseling sessions and had worked with Goede on parenting skills, although they had stopped the classes after Lorena's baby was born in July 2003.

Goede testified that she had a master's degree in counseling and was a certified professional counselor and licensed mental health practitioner. She had been a caseworker with the Department from 1997 to 2001. Goede was first referred to Lorena's family to treat Aaron when he was placed in foster care in Norfolk, Nebraska, where Goede's practice was located. Goede later began treating Irving, Lorena, and Carmen. Goede testified that she had been making progress with Aaron, but that her treatment of Aaron was terminated in June 2003 following a meeting with Lorena and representatives of the Department. Goede stated that she had opined that Lorena's visits with Aaron did not need to be supervised and that the Department then terminated her services as Aaron's therapist based on a "conflict of interests." Wright testified that Goede was "not following with all of the therapy goals that we had requested her to do," because Goede disagreed with a proposal to change the reunification plan.

Goede also testified that she had worked with Lorena on parenting skills. Goede stated that Lorena watched a series of Spanish-language videotapes that modeled different types of parenting skills. Goede was also able to obtain a Spanish-language parenting program from Girls and Boys Town called "Common Sense Parenting," and Lorena participated in that as well. Goede

testified that Lorena had actively participated in that training, did her homework and reading assignments, and successfully completed all of the materials that Goede had given to her. Goede explained that she had set up situations in family sessions with Lorena and Carmen and that Goede had seen improvement in Carmen's behavior and how Lorena handled Carmen. Goede also testified that she had done home visits with Lorena and Carmen and had observed "growing structure in her home" environment as a result of the parenting skills instruction.

Goede testified that prior to the termination of her treatment of Aaron, he had been having behavioral issues, including sexual issues—for instance, pulling up a dress of another child in school. Goede opined that Aaron's behavioral issues were due, in large part, to the lack of structure in the home and that "Aaron was a very distressed kid certainly, especially during that time. And children will do some pretty funky things when they're distressed." Goede opined that Aaron could be harmed if his relationship with Carmen was cut off, because Aaron felt guilty about hurting Carmen, and would be unable to deal with that issue. Goede further opined that Aaron would be harmed by discontinuation of his relationship with Irving. Wright testified that termination of Lorena's parental rights would not affect the sibling relationship between Aaron and Irving because Aaron's foster parents were willing to provide visitation between the brothers.

Goede testified that she had seen Lorena and Aaron together twice before her treatment of Aaron was terminated. Goede described Lorena and Aaron's relationship as playful, warm, and comfortable. Goede opined that terminating Lorena's parental rights could result in a sense of abandonment for Aaron and that Aaron might blame himself. Goede did not opine on whether Aaron should be allowed to live with Lorena, because Goede was not, at the time of trial, "prepared to be able to answer that without knowing where things are with [Lorena] and what she is able to provide Aaron." Goede said that in her treatment of Aaron, he had consistently expressed a desire to live with Lorena, although he wanted to visit his foster mother. During Aaron's testimony, however, the following colloquy took place with the guardian ad litem:

Q- Do you remember me talking to you about whether you'd like to live with your [foster mother] or mom, Lorena, and visit the other one?

A- Yeah.

Q- Do you remember what you told me?

A- No.

Q- Okay. Is it possible that you told me you wanted to live with [your foster mother] and visit your mom, Lorena? You might have said that? Does that mean yes?

A- Yes.

Q- You love both [your foster mother] and mom Lorena?

A- Yes.

Q- And you don't want to hurt either one of their feelings?

A- Yeah.

Q- You agree with me, you don't want to hurt their feelings? Is that yes?

A- Yes.

Wright testified that Lorena's visitation with Aaron was initially set up as weekly, but that Lorena was inconsistent in that visitation. Wright stated that because Aaron had been placed in Norfolk, which is located some distance from Fremont, transportation services had been provided to Lorena. Lorena later testified that it was "an hour and a half, no less" from Fremont to Norfolk and that she did not have a driver's license, but she admitted that the Department had provided transportation after Aaron was placed in Norfolk. Visitation between Lorena and Aaron was also provided in Wayne, Nebraska, where Irving is placed, because Irving is wheelchair-bound and it was difficult to transport Irving to another location to allow the boys to be together for their visits with Lorena.

Between May 12 and October 22, 2003, Lorena missed 16 of 27 in-person visits and 17 of 21 telephone visits. At the request of Lorena and her attorney, Lorena's visitation with Aaron was reduced to monthly, although Lorena requested an increase to two visits per month shortly before trial. Lorena testified that she missed visitation "when I had the baby," because she got an infection and "the doctor said that I just couldn't be some place where I might pick up a bacteria." Lorena also testified that sometimes when she called to speak to Aaron, he was not available to

speak to her. The parties disputed the circumstances surrounding the cancellation or failure of particular scheduled visits. Wright admitted that Lorena had given birth in July 2003 and that Lorena had told Wright that Lorena was not permitted to travel on a few occasions before the child was born.

Lorena said that when she visited with Aaron, she was told by the family support worker that she was supposed to speak English to the children. Lorena claimed that she was not allowed to speak Spanish to Aaron, although the children speak Spanish and Lorena's English is very limited. The family support worker interpreted between Lorena and Aaron. Lorena also testified that the family support worker's Spanish was poor.

Wright admitted that a Spanish-language copy of Lorena's case plan had not been prepared for her until 2003. Lorena testified that she had been provided with case plans in English, that the requirements had been explained to her in Spanish, "and [that] they basically just told me what they wanted, and it wasn't until [the interpreter] actually read the whole thing to me in Spanish, that I thought that maybe I had made some mistakes." Even after the case plans were provided in Spanish, Lorena testified that there were still many words she did not understand.

Wright concluded her testimony with her opinion that the best interests of Aaron required permanency, which could only be provided by termination of Lorena's parental rights. Wright admitted, on cross-examination, that she had not been present for all of Lorena's visits with Aaron; Wright testified that she had been present "at least twice" during Lorena's visits "some time ago." Wright stated that her opinion was based on reports from the family support worker or visitation supervisor, although she admitted that one of the most recent supervisors did not speak Spanish. Wright was the State's only witness.

On April 23, 2004, the court ordered the termination of Lorena's parental rights. The court found that Aaron was wayward or habitually disobedient, uncontrolled by Lorena, and habitually truant. The court's order refers to an incident in January 2002 in which Aaron was suspended from school for striking another student, although this incident does not appear to be otherwise reflected in the appellate record. The court concluded that Lorena had not made progress in preparing her home or

circumstances for reunification. The court concluded that Aaron had been in out-of-home placement for 15 or more of the most recent 22 months and that it was in his best interests that Lorena's parental rights be terminated. Consequently, the court terminated Lorena's parental rights. Lorena perfected this timely appeal.

## ASSIGNMENTS OF ERROR

Lorena assigns, as consolidated and restated, that the court erred in (1) determining that Lorena's parental rights should be terminated pursuant to § 43-292(7) and that it was in Aaron's best interests to terminate Lorena's parental rights, (2) not requiring the State to prove noncompliance with a reasonable rehabilitation plan prior to termination, (3) refusing to declare § 43-292(7) unconstitutional as violative of Lorena's substantive due process rights, (4) refusing to allow testimony about the history of Lorena's parental care, and (5) refusing to allow the testimony of Irving. Lorena also contends that the court had no jurisdiction to enter any order with respect to Lorena or Aaron due to the State's failure to notify her country of origin pursuant to the Vienna Convention on Consular Relations.

## STANDARD OF REVIEW

In an appeal from a judgment or order terminating parental rights, an appellate court, in a trial de novo on the record and disregarding impermissible or improper evidence, determines whether there is clear and convincing evidence to justify termination of parental rights under the Nebraska Juvenile Code. *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003).

## ANALYSIS

We turn first to whether the State proved by clear and convincing evidence that termination of Lorena's parental rights was in Aaron's best interests. It is well established that a juvenile's best interests are a primary consideration in determining whether parental rights should be terminated as authorized by the Nebraska Juvenile Code. *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). A parent's interest in the accuracy and justice of the decision to terminate his or her parental rights is a commanding one. *In re Interest of*

*Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999). Before parental rights may be terminated, the evidence must clearly and convincingly establish the existence of one or more of the statutory grounds permitting termination and that termination is in the juvenile's best interests. *In re Interest of Rebecka P.*, 266 Neb. 869, 669 N.W.2d 658 (2003). The grounds for terminating parental rights must be established by clear and convincing evidence, which is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved. *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999).

The State sought to terminate Lorena's parental rights solely on the basis of § 43-292(7). Section 43-292 provides:

The court may terminate all parental rights . . . when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:

(1) The parents have abandoned the juvenile for six months or more immediately prior to the filing of the petition;

(2) The parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection;

(3) The parents, being financially able, have willfully neglected to provide the juvenile with the necessary subsistence, education, or other care necessary for his or her health, morals, or welfare or have neglected to pay for such subsistence, education, or other care when legal custody of the juvenile is lodged with others and such payment ordered by the court;

(4) The parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the juvenile;

(5) The parents are unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period;

(6) Following a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts to preserve and reunify the family if required under section 43-283.01, under the direction of the court, have failed to correct the conditions leading to the determination;

(7) The juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months;

(8) The parent has inflicted upon the juvenile, by other than accidental means, serious bodily injury;

(9) The parent of the juvenile has subjected the juvenile to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse; or

(10) The parent has (a) committed murder of another child of the parent, (b) committed voluntary manslaughter of another child of the parent, (c) aided or abetted, attempted, conspired, or solicited to commit murder, or aided or abetted voluntary manslaughter of the juvenile or another child of the parent, or (d) committed a felony assault that resulted in serious bodily injury to the juvenile or another minor child of the parent.

Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. Because the State proceeded solely under § 43-292(7), we must be particularly diligent in our de novo review of whether termination is, in fact, in Aaron's best interests. Generally, when termination is sought under other subsections of § 43-292, the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. Section 43-292(7) requires no such proof; thus, it is in the context of analyzing the best interests of the juvenile that courts must respect a parent's "commanding" interest in the accuracy and justice of the decision to terminate parental rights. See *In re Interest of Kassara M.*, 258 Neb. 90, 94, 601 N.W.2d 917, 922 (1999). As we stated in *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 257, 674 N.W.2d 442, 463 (2004):

The 15-month condition set forth in § 43-292(7) serves the purpose of providing a reasonable timetable for parents to rehabilitate themselves. . . . But termination based on the ground that a child has been in out-of-home placement for 15 of the preceding 22 months is not in a child's best interests when the record demonstrates that a parent is making efforts toward reunification and has not been given a sufficient opportunity for compliance with a reunification plan.

(Citation omitted.)

■ We do not mean to suggest that termination solely on the basis of § 43-292(7) cannot be appropriate. Obviously, there will be cases in which clear and convincing evidence to that effect will be presented. But that may prove difficult in cases where the record is insufficient to prove any of the other statutory grounds—i.e., where the parent did not abandon the child, did not neglect to protect or provide for a child, was not unfit or unable to parent, did not fail to participate in necessary rehabilitation, and was not abusive. In such cases, where termination of parental rights is sought solely pursuant to § 43-292(7), proof that termination is nonetheless in a juvenile's best interests will, necessarily, require clear and convincing evidence of circumstances as compelling and pertinent to a child's best interests as those enumerated in the other subsections of § 43-292.

Such evidence is lacking in this case. We acknowledge that the record does not reflect that Lorena has accomplished all of the goals set forth in her case plan. However, the record indicates she has progressed, and, as will be explained below, her "opportunities for compliance [with the case plan] may have been limited." See *In re Interest of Rebecka P.*, 266 Neb. 869, 881, 669 N.W.2d 658, 667 (2003). Most significant, however, is the failure of the State to produce the clear and convincing evidence required to show that termination would be in Aaron's best interests.

As previously stated, the sole witness to testify for the State at trial was Wright. Obviously, the Department's caseworker for a particular family is likely to be an important witness for all the parties. But here, the State used Wright as a proxy for all of the other witnesses whose expertise and testimony would have been helpful, and perhaps essential, in determining what was in Aaron's best interests. Wright's testimony was based to some

extent on her own observations, but in large measure on Wright's review of the records and reports generated by the family support workers, therapists, foster parents, and others who directly observed the parties.

■ In short, much of Wright's testimony—and thus, much of the State's case—was based on hearsay. While the Nebraska Evidence Rules do not apply in juvenile proceedings, the basic requirements of due process oblige a court to consider the type of evidence used by the State in order to determine the weight to be given to that evidence. See, *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999); *Johanson v. Board of Ed. of Lincoln Cty.*, 256 Neb. 239, 589 N.W.2d 815 (1999). It is very difficult, with the record presented in this case, to give substantial weight to some of the key allegations made by Wright.

For instance, in Wright's final "Court Report," filed on the same date as the State's petition to terminate parental rights, one of the primary reasons cited for the decision to change Aaron's "permanency objective" to adoption—i.e., to terminate Lorena's parental rights—was that "it is reported that [Lorena] is unable to parent/manage her 4-yr old daughter during visits, forcing service providers to intervene." In other words, the State's evidence is Wright's report that *someone else* reported that Lorena was unable to manage Carmen. This hearsay contrasts sharply with Goede's testimony, which was based on her treatment of Lorena and Carmen and personal observation of the two of them together. As noted above, Goede testified that Lorena had participated in exercises intended to teach parenting skills, that Goede had seen improvement in Carmen's behavior and how Lorena handled Carmen, and that Goede had, on visits to Lorena's home, seen the home structure changing as a result of her parenting skills instruction. The foundation presented for Goede's testimony makes it more credible and persuasive than the hearsay evidence adduced by the State.

Similarly, Goede's testimony about her treatment of Aaron was not matched by the State with equally well-founded evidence. Goede admittedly had not treated Aaron for 7 to 8 months before trial, but testified, based on that treatment, that Aaron would be harmed by termination of his relationship with Lorena

and Carmen. We are mindful of Goede's conclusion. See *In re Interest of Rebecka P.*, 266 Neb. 869, 669 N.W.2d 658 (2003). Yet, the State presented no evidence to the contrary. The State did not present testimony from, or even reports or records authored by, any of Aaron's therapists subsequent to Goede. Absent a few instances during Wright's testimony where she referred to events occurring after the filing of the State's termination petition, the record is devoid of evidence showing what was happening in Aaron's life between the filing of the petition in October 2003 and trial in February 2004.

Because the primary consideration in determining whether to terminate parental rights is the best interests of the child, a juvenile court should have at its disposal the information necessary to make the determination regarding the minor child's best interests regardless of whether the information is in reference to a time period before or after the filing of the termination petition. *In re Interest of Andrew M., Jr., & Marceleno M.*, 9 Neb. App. 947, 622 N.W.2d 697 (2001). Yet, the juvenile court in this case, and this court for its de novo review, was not provided with such evidence. Aaron's therapists did not testify. The Department's family support workers, who actually observed Aaron and Lorena, did not testify, nor did Aaron's foster parents, nor Aaron's teachers. The State seems to have forgotten that the focus of this proceeding is not Lorena, but Aaron, and the State thus did not present evidence directly adduced from many of the people most able to testify as to Aaron's condition, circumstances, and best interests, both before and after the filing of the termination petition. The standard for proving that termination of parental rights is in a juvenile's best interests is clear and convincing evidence, and the evidence in this record is, simply stated, neither clear nor convincing.

This is not to suggest that we are not concerned by some of the State's evidence, which raises doubts about Lorena's ability to be an effective parent. Lorena's unemployment, living situation, and failure to consistently visit Aaron are certainly troubling. But the record also suggests that those circumstances are mitigated by factors that were beyond Lorena's control. For instance, while Lorena's failure to observe her visitation arrangements is not completely explained by the record, the State did not contradict

Lorena's testimony, summarized above, that she was unable to reach some of her scheduled visits because of pregnancy and the needs of her other children. This would not be surprising, given the distance between Lorena's home and Aaron's foster home in Norfolk. It may well have been necessary, as Wright testified, to place Aaron in Norfolk in order to provide him with the services he required. Nonetheless, in determining the weight to be given to Lorena's inconsistent visitation, we cannot overlook the fact that Lorena's visitation plan was, from the outset, likely to fail, "not necessarily because she was unfit, but because she was poor and because she was located at such a great distance from the children." See *In re Interest of L.J., J.J., and J.N.J.*, 220 Neb. 102, 110, 368 N.W.2d 474, 480 (1985).

■ Furthermore, the record does not contain any dispositional orders setting forth court-ordered rehabilitation plans, and we cannot review the reasonableness of case plans that are not contained in the record. The inadequacy of this record is not due to Lorena's failure to provide a record in support of claimed errors. See *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004). Rather, the State failed to introduce that evidence in support of its contention that Lorena failed to meet the requirements of her rehabilitative plan, and is relying on Lorena's alleged failure to comply with requirements that are not fully evidenced by the record. The record contains only one "Case Plan and Progress Report," and that is the October 22, 2003, case plan that was attached to the court report filed by the State on the same day as its petition to terminate parental rights. We cannot determine from this record whether, or to what extent, Lorena's case plans were the subject of court order or court review. Compare *In re Interest of L.J., J.J., and J.N.J., supra*. The State cannot prove that termination of parental rights is in a child's best interests by implementing an unreasonable rehabilitative plan, see *id.*, and because no court-ordered plan is part of our record, the reasonability of the requirements imposed on Lorena is uncertain. Under those circumstances, we cannot find Lorena's alleged noncompliance with the requirements of her rehabilitation plan to be clear and convincing evidence that termination of her parental rights is in Aaron's best interests.

We also note Goede's uncontradicted testimony that Aaron would be harmed by the termination of his relationship with Carmen, which would be a de facto result of terminating Lorena's parental rights. Juvenile courts must recognize, if possible, the interests of siblings. *Id.* The benefits to Aaron of potentially maintaining a relationship with Carmen and his other siblings also weigh against termination of parental rights, in the absence of clear and convincing evidence that termination is nonetheless in Aaron's best interests.

■ We have stated that termination of parental rights is permissible " '[i]n the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code . . . .' " *In re Interest of Kantril P. & Chenelle P.*, 257 Neb. 450, 467, 598 N.W.2d 729, 741 (1999). Accord *In re Interest of Crystal C.*, 12 Neb. App. 458, 676 N.W.2d 378 (2004). After our de novo review of the record, we do not find clear and convincing evidence that termination was in Aaron's best interests. "[T]he law does not require perfection of a parent. Instead, we should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child." *Id.* at 465, 676 N.W.2d at 384. Those things are present here.

■ We conclude that the county court erred in finding that the State established, by clear and convincing evidence, that termination of Lorena's parental rights was in Aaron's best interests. Having so concluded, we do not address Lorena's remaining assignments of error. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it. *Burke v. McKay*, 268 Neb. 14, 679 N.W.2d 418 (2004). However, because she contends that it presents a jurisdictional issue, we note Lorena's argument that the county court lacked jurisdiction because of the State's failure to notify the Mexican consulate of these proceedings pursuant to the Vienna Convention on Consular Relations, *signed* Apr. 24, 1963, art. 37, 21 U.S.T. 77, 102 (hereinafter the Convention), which provides:

> If the relevant information is available to the competent authorities of the receiving State, such authorities shall have the duty:

. . . .

(b) to inform the competent consular post without delay of any case where the appointment of a guardian or trustee appears to be in the interests of a minor or other person lacking full capacity who is a national of the sending State. We are aware of authority contrary to Lorena's position that compliance with the Convention presents a jurisdictional prerequisite to an action. See *In re Stephanie M.*, 7 Cal. 4th 295, 867 P.2d 706, 27 Cal. Rptr. 2d 595 (1994). Cf. *Breard v. Greene*, 523 U.S. 371, 118 S. Ct. 1352, 140 L. Ed. 2d 529 (1998) (suggesting claimant must show prejudice resulting from alleged violation of Convention); Case Concerning Avena and Other Mexican Nationals (Mexico v. United States of America), 2004 I.C.J. 1, No. 128 (March 31, 2004) (courts must determine if violation of Convention caused actual prejudice).

But regardless of whether it is jurisdictional, we cannot analyze this issue because the only indication before this court of a violation of the Convention is the argument contained in Lorena's brief. In the absence of any evidence with respect to whether the State informed the Mexican consulate of Lorena's case, we cannot conduct a meaningful analysis.

## CONCLUSION

The State did not present clear and convincing evidence that termination of Lorena's parental rights was in Aaron's best interests. The most persuasive evidence presented to the county court showed that while Lorena's improvement was sporadic, she had made progress toward being a capable parent for her children, despite significant impediments, some of which were Lorena's own doing, but some of which were placed in her path by the Department and other circumstances. The only expert testimony present in the record pertinent to how termination would affect Aaron indicated that he would be harmed by the termination of Lorena's parental rights. The State almost completely failed to provide the county court, and by extension this court, with testimony from many of the people whose opinions and observations would have been most pertinent to the principal issue—Aaron's best interests. The evidence the State did present

was largely based on hearsay and was simply not "clear and convincing."

The judgment of the county court is reversed.

REVERSED.