IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF RAY'CINE L.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF RAY'CINE L., A CHILD
UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
SYLVESTER M., APPELLANT.

IN RE INTEREST OF DEJAN L., A CHILD
UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
SYLVESTER M., APPELLANT.

Filed June 18, 2013.    Nos. A-12-233, A-12-234.

Appeal from the Separate Juvenile Court of Douglas County: CHRISTOPHER KELLY, Judge. Affirmed.

Matthew R. Kahler, of Finley & Kahler Law Firm, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, and Jennifer C. Clark for appellee.

IRWIN, PIRTLE, and RIEDMANN, Judges.

IRWIN, Judge.

## I. INTRODUCTION

In 2010, the separate juvenile court of Douglas County, Nebraska, terminated the parental rights of Sylvester M. concerning his two children, Ray'Cine L. and Dejan L. Sylvester appealed, and in a memorandum opinion filed on April 26, 2010, in cases Nos. A-09-993 and A-09-994, we reversed the juvenile court's orders of termination, finding that the State had not

- 1 -

sufficiently demonstrated a statutory basis for terminating his parental rights. In December 2011, the State filed a second petition to terminate his parental rights, and in February 2012, the juvenile court entered orders terminating his parental rights a second time.

Sylvester now appeals from those orders, asserting that the State failed to sufficiently demonstrate (1) that statutory grounds existed for termination of his parental rights and (2) that termination of his parental rights is in the best interests of the children. We have consolidated these appeals. We find that the children have been in a continuous out-of-home placement for well in excess of 15 or more of the last 22 months and that termination of Sylvester's parental rights is in the best interests of the children. As such, we affirm.

## II. BACKGROUND

The two children at the heart of this case have been involved with the Nebraska Department of Health and Human Services (DHHS) for essentially their entire lives. Because a complete picture of their situation is vital to an understanding and appreciation for the resolution of this case, we will recount the relevant factual and procedural background involving the children, including some information previously set forth in our prior memorandum opinion.

Ray'Cine and Dejan were born into an unconventional situation. The children's biological mother, Deja L., was "raised" by Sylvester's cousin, and when the cousin passed away, in approximately 2005, Sylvester took Deja in because she had nowhere else to stay. Deja was born in 1988 and would have been approximately 17 years of age in 2005; Sylvester was born in 1949 and would have been approximately 56 years of age in 2005. Ray'Cine was born in May 2007, and Dejan was born in January 2009.

Deja came to the attention of DHHS on June 1, 2007, immediately after Ray'Cine's birth, as a result of concerns about drug use and inappropriate parenting of Ray'Cine. At that time, Sylvester was not identified as the biological father and DHHS was told that Sylvester was Deja's uncle, as Sylvester apparently feared that he would get into trouble for being approximately 58 years of age and having sex with Deja when she was under 19 years of age.

The State filed a petition with the juvenile court in August 2007, seeking an adjudication that Ray'Cine was within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2006) by reason of the faults or habits of Deja. Ray'Cine was placed in the custody of DHHS on September 13, 2007. Deja relinquished her parental rights to Ray'Cine in December 2008.

Genetic test results in June 2008 revealed that Sylvester was Ray'Cine's biological father. As a result, in October 2008, the State filed a supplemental petition seeking adjudication of Ray'Cine as related to Sylvester and seeking termination of Sylvester's parental rights. In June 2009, the juvenile court entered a dispositional order requiring Sylvester to take various actions.

Dejan was born in January 2009. Within 1 week of his birth, the State filed a petition with the juvenile court alleging that he came within the meaning of § 43-247(3)(a) (Reissue 2008) by reason of the faults or habits of Deja. The juvenile court entered an order placing Dejan in the custody of DHHS on February 9. Dejan was temporarily placed with Deja from February 18 through March 24, but was returned to the custody of DHHS. Deja's parental rights to Dejan were terminated in September.

In June 2009, the State filed a supplemental petition seeking adjudication of Dejan as related to Sylvester and seeking termination of Sylvester's parental rights.

In September 2009, the juvenile court held adjudication/termination hearings for both Ray'Cine and Dejan, as related to Sylvester. Evidence was adduced concerning Sylvester's visitation with the children, participation and progress in family support services, and housing and income situation. At that time, much of the concern with respect to Sylvester's parenting the children was focused on whether he could sufficiently protect them from being exposed to Deja's use of drugs, anger, and violence. The juvenile court entered orders adjudicating both Ray'Cine and Dejan as being within the court's jurisdiction as related to Sylvester and terminating his parental rights to the children.

Sylvester appealed the first termination of his parental rights to Ray'Cine and Dejan. In a memorandum opinion filed on April 26, 2010, we reversed the first termination of Sylvester's parental rights to Ray'Cine and Dejan, finding that the State had not sufficiently proven the existence of any of the alleged statutory grounds to support termination of parental rights. We specifically did not reach the issue of whether termination of Sylvester's parental rights was in the best interests of the children.

After this court's reversal of the first termination of Sylvester's parental rights, the juvenile court conducted review hearings and entered dispositional orders in August 2010, April 2011, and October 2011. In all three orders, the court required Sylvester to participate in scheduled visitation with Ray'Cine and Dejan, to cooperate with various support workers, and to maintain adequate housing and consistent income. In the August and April orders, the court required Sylvester to complete a pretreatment assessment and a parenting assessment, to release medical and mental health records, and to complete a parenting class. In addition, Sylvester was ordered to participate in family counseling with Ray'Cine and Dejan and to provide a list of family and friends capable of providing an informal support system to help him parent the children.

In the October 2010 review hearing, the State indicated that it was still awaiting Sylvester's release of medical and mental health records. The State indicated that its review of the records was important to determining what services might be offered to Sylvester to facilitate reunification and preservation of the family. The juvenile court stressed to Sylvester during the hearing that he needed to comply with the court's order to release his medical and mental health records.

In the April 2011 review hearing, the State indicated that it had only recently received the medical and mental health records that Sylvester had been ordered to release. The State indicated that Sylvester did not sign the release forms until approximately March 2011. The State also represented that it had been attempting to get the records from Sylvester for approximately 2 years. The State expressed concern about Sylvester's ability to parent the children, noting that he had been diagnosed as a paranoid schizophrenic, had missed approximately 35 scheduled visitations since the prior November, and had not completed many of the requirements ordered by the court. Sylvester's attorney argued that he had shown an ability to parent, that he had a large family that could assist him, and that his visitation should be increased.

In October 2011, the juvenile court conducted another review hearing. Sylvester did not appear in his own behalf, and his attorney indicated a lack of knowledge about why Sylvester

was not present. The State argued that there had not been progress in bonding between Sylvester and the children, argued that Sylvester continued to not make progress despite being given a second chance by this court's reversal of the first termination of his parental rights, and noted that Ray'Cine and Dejan had been in foster care for essentially their entire lives. Sylvester's guardian ad litem and his attorney argued that he had maintained stable housing and income, had complied with most of the court's requirements--except for completion of parenting and pretreatment assessments--and that his visitation should be increased and changed to unsupervised visitation.

In December 2011, the State filed a second petition for termination of Sylvester's parental rights to Ray'Cine and Dejan. The State alleged that statutory grounds for termination of parental rights existed because Sylvester had substantially and continually neglected Ray'Cine and Dejan within the meaning of Neb. Rev. Stat. § 43-292(2) (Cum. Supp. 2012), because reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to adjudication of Ray'Cine and Dejan within the meaning of § 43-292(6), and because the children had been in an out-of-home placement for 15 or more of the most recent 22 months within the meaning of § 43-292(7). The State also alleged that termination of Sylvester's parental rights was in the best interests of Ray'Cine and Dejan.

In February 2012, the juvenile court conducted a hearing on the State's second petition to terminate Sylvester's parental rights. The State adduced testimony from a mental health practitioner and play therapist who had been assigned to this case, from a DHHS child and family outcome monitor who had been assigned to this case, from a family permanency specialist who had been assigned to this case, and from a family support and visitation specialist who had overseen Sylvester's visitations with Ray'Cine and Dejan. The foster parent in whose home Ray'Cine and Dejan have lived throughout the entirety of the juvenile court proceedings also testified. Sylvester did not testify in his own behalf.

Through the testimony of the various support workers who had been assigned to this case and who had worked with Sylvester, Ray'Cine, and Dejan, the State presented evidence concerning Sylvester's progress toward being in a position to parent the children, as well as the difficulties experienced in attempting to support and assist Sylvester. That testimony concerned the statutory grounds for terminating his parental rights, as well as whether the children's best interests would be served by terminating his parental rights.

The evidence adduced demonstrated that Ray'Cine has been in an out-of-home placement since October 2007, when she was 4 months old. Dejan has been in an out-of-home placement since March 2009, when he was 6 weeks old. The foster parents had previously adopted an older sibling of Ray'Cine and Dejan.

The evidence demonstrated that there is no dispute that Sylvester complied with some of the court's orders. For example, there is no dispute that Sylvester maintained appropriate and safe housing and had stable income throughout the proceedings. Sylvester was on disability, but had sufficient income to consistently pay child support in the amount of $400 per month. The DHHS child and family outcome monitor testified that she had no concerns about the appropriateness of Sylvester's home or about his financial position. Sylvester himself, however, did not believe his home was adequate for the children, and he expressed that he was "not

comfortable" having them in the home and that he felt the home was too small to accommodate them.

In addition, Sylvester did participate in visitation throughout the proceedings. There was no court order to allow visitation during Sylvester's appeal of the first termination of his parental rights, so he did not have visitation during the pendency of that appeal. Once visitation was reestablished, Sylvester expressed a desire to move slowly with visitation and establishing a relationship with the children. Sylvester's attendance at visitation was described in conflicting ways by the witnesses, including being characterized as "not consistent" and as "fairly consistent." Although there were apparently some months where Sylvester's attendance was better than others and there were apparently some periods of time where he might not have missed any scheduled visits for a couple of months, there were other times where he did miss scheduled visits. The testimony at one of the review hearings indicated that between November 2010 and March 2011, for example, Sylvester attended approximately only 20 of 55 scheduled visitations. Sylvester apparently would call if he was unable to attend a scheduled visitation, and he usually attributed the inability to attend to illness or medical reasons. The support workers testified that they had no reason to doubt Sylvester's veracity in indicating that cancellations were related to his medical issues.

Throughout the proceedings--and particularly, during the nearly 2 years between this court's reversal of the first termination of Sylvester's parental rights and the hearing on the second petition to terminate parental rights--Sylvester's visitation with Ray'Cine and Dejan was always supervised. Additionally, Sylvester's visitation time was never significantly increased, at least partially because he expressed a desire not to have additional time with Ray'Cine and Dejan. The DHHS child and family outcome monitor testified that she spoke with Sylvester about increasing his visitation time with the children and that Sylvester responded he did not desire additional visitation time "because he had physical therapy and other stuff going on, and he was comfortable with just the three" visitations per week, which lasted 2 or 3 hours at a time.

The family support and visitation specialist testified that Sylvester had made improvements in his interactions with the children and that he was doing "a pretty good job" of parenting the children during visitations. He acknowledged that his reports to the court had indicated that Sylvester's discipline with the children was "hit and miss," that at times Sylvester did not engage in structured activities, and that Ray'Cine had significant behavioral issues during visitations.

Sylvester did complete a parenting class with the family support and visitation specialist. The parenting class included instruction on "everything from discipline to how to show children affection." The specialist testified that he had witnessed Sylvester's adopting "some" of the principles covered during the parenting class in the way he handled Ray'Cine and Dejan during visitations.

The evidence also demonstrated that Sylvester at least partially complied with some of the court's other orders. For example, in the August 2010 dispositional order, the juvenile court ordered Sylvester to work with DHHS to develop an informal support system to assist him with caring for the children. The DHHS child and family outcome monitor testified that she spoke with Sylvester about family support and that Sylvester had difficulty providing a list of people who could assist him. She testified that when Sylvester did come up with names of people who

could assist, he did not provide her any contact information to enable her to actually contact any of them. The record reflects that although Sylvester had an "older son" who attended at least one support team meeting with Sylvester, Sylvester did not include his son in the list of contacts who could assist him.

In the October 2011 dispositional order, the juvenile court ordered Sylvester to participate in family therapy. The mental health practitioner and play therapist who was providing family therapy testified that she began family therapy in September 2011 and that she was still providing it as of the time of the termination hearing in February 2012. She testified that she had wanted Sylvester to be involved and that his participation was important to developing necessary skills for parenting the children at home. She testified that Ray'Cine had behavioral issues that would not improve without therapy. After the court ordered Sylvester to participate, the therapist attempted to contact Sylvester and she "called and left several messages," as well as wrote a letter to Sylvester to invite him to attend and participate in therapy. She received no response from Sylvester.

In January 2012, Sylvester showed up at one family therapy session, without notifying anyone ahead of time that he was going to attend. Ray'Cine reacted to Sylvester's appearance at the therapy session by clinging to the foster parent, crying, and "screeching" very loudly. After a few minutes, Sylvester indicated that it looked "too hard" on Ray'Cine and he left. He never returned for any other sessions. The therapist testified that she agreed with Sylvester that his appearance, unannounced, had been too hard on Ray'Cine because there had been no opportunity to prepare her for his involvement. She testified that she would have encouraged his participation if he had expressed an interest in returning for any other sessions, but he never did.

The dispositional orders entered in August 2010, April 2011, and October 2011, all included a requirement that Sylvester cooperate with the various support workers. The various support workers who testified at the termination of parental rights hearing indicated that communication with Sylvester was difficult and that he frequently did not respond to attempts to communicate or to messages left for him. For example, the mental health practitioner and play therapist testified that she left several messages for Sylvester beginning in September 2011 concerning his participation in family therapy and that she left her contact information for Sylvester to get in touch with her. She left another message for Sylvester in October 2011. Sylvester did not respond to these attempts at communication.

Similarly, the DHHS child and family outcome monitor testified that she attempted to maintain contact with Sylvester, but that his contact with her was "sporadic." She testified that "sometimes it was harder to get ahold of him than others, but eventually [she] could usually get ahold of him." She described having "to leave messages for him a lot," and although there were times when Sylvester would respond promptly, there were also times when she "would have to call several times and leave several messages before [she] got a return call." She testified that one of the difficulties experienced in attempting to provide services for Sylvester was that "he would agree in meetings or with visits to do some of the services" but that after the meeting or visit, "it was hard for any provider to get ahold of him to do these, and he wouldn't follow through."

The family permanency specialist testified that she was assigned this case in October 2011 and that between that time and the termination of parental rights hearing in February 2012,

she never had any contact with Sylvester. She testified that she made attempts to have contact with Sylvester by telephone, as well as through the other support workers. She testified that she made monthly calls to Sylvester and that she left voicemail messages for him, but did not receive any return call. She testified that Sylvester was also sent a letter providing information that she had been assigned to the case and her contact information. She testified that she was told by other support workers that Sylvester had indicated that he did not want to have contact with her. Because of Sylvester's refusal to have contact with her, she was unable to set up and provide services for him.

Finally, the evidence adduced also demonstrated that with respect to some of the items ordered by the court and with respect to additional opportunities to be involved with the children, Sylvester expressly indicated a lack of interest. Both the August 2010 and the April 2011 dispositional orders specifically directed Sylvester to complete a pretreatment assessment and a parenting assessment. Sylvester never completed these requirements, although the support workers made referrals to assist him in doing so. The DHHS child and family outcome monitor testified that she spoke with Sylvester about the assessments when she met with him "each month" and that she reminded him they were ordered by the court and the court wanted him to complete them to work toward reunification with Ray'Cine and Dejan. Sylvester's attorney and guardian ad litem also spoke with him about the assessments. The evidence indicated that Sylvester refused to complete the assessments because, in his opinion, they were not necessary and "he didn't feel he needed to do them." The DHHS child and family outcome monitor testified that although Sylvester had completed a parenting class, there were other parenting concerns and without the assessments there was no way to determine what other services might have benefited Sylvester or could have been offered to him.

The children's foster parent testified that she had invited Sylvester to attend a variety of activities that the children were involved in. She testified that she had invited Sylvester to attend the children's swim lessons, school open house, and kindergarten roundup. Sylvester never accepted the invitations or attended any of these activities.

The children's foster parent also testified that both Ray'Cine and Dejan had, at times, referred to themselves using the names "Mackenzie" and "Cameron." She testified that when the juvenile court granted the first petition to terminate Sylvester's parental rights, the foster parents had intended to adopt both children and spoke with them about possibly changing their names. She testified that the foster parents have attempted to stop Ray'Cine and Dejan from referring to themselves by the alternative names.

During the course of the hearing on the second petition to terminate Sylvester's parental rights, both the mental health practitioner and play therapist and the family permanency specialist gave opinions about whether termination of Sylvester's parental rights was in the best interests of Ray'Cine and Dejan. The mental health practitioner and play therapist opined that termination of parental rights was in Ray'Cine's best interests and indicated that she based her opinion on the fact that Sylvester had "not responded at all to any . . . overtures to become involved in Ray'Cine's emotional and social well-being." The family permanency specialist also opined that termination of parental rights was in the children's best interests. She testified that she did not believe Sylvester can provide for the children, that he would have difficulty parenting the children on a 24-hour-a-day and 7-day-a-week basis, and that she was concerned about

Sylvester's refusal to have contact with her or to complete the court-ordered assessments. Relatedly, the DHHS child and family outcome monitor testified that Sylvester did not make progress in his ability to have the children live with him, that he refused to participate in ordered assessments, and that the children did not become more bonded with Sylvester through the established visitation.

On February 16, 2012, the juvenile court entered orders terminating Sylvester's parental rights to Ray'Cine and Dejan. The court found that the State had demonstrated, by clear and convincing evidence, both that statutory grounds for termination of parental rights existed and that termination of Sylvester's parental rights was in the best interests of Ray'Cine and Dejan. These appeals followed.

## III. ASSIGNMENTS OF ERROR

Sylvester assigns two errors. First, Sylvester asserts that the juvenile court erred in finding that a statutory ground existed for termination of his parental rights. Second, Sylvester asserts that the court erred in finding that termination of his parental rights would be in the best interests of Ray'Cine and Dejan.

## IV. ANALYSIS

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Jagger L.*, 270 Neb. 828, 708 N.W.2d 802 (2006); *In re Interest of Jacob H. et al.*, 20 Neb. App. 680, ___ N.W.2d ___ (2013). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

### 1. STATUTORY GROUNDS FOR TERMINATION

Sylvester first assigns as error that the juvenile court erred in finding that the State had proven statutory grounds for termination of his parental rights. The State alleged statutory grounds existed pursuant to § 43-292(2), (6), and (7). In its order terminating Sylvester's parental rights, the juvenile court found that all three statutory grounds had been proven. We find that there is no dispute that the statutory time limits established by § 43-292(7) were proven, and, accordingly, we do not further discuss the requirements of § 43-292(2) and (6). We find no merit to this assignment of error.

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in that section have been satisfied and that termination is in the children's best interests. *In re Interest of Jacob H. et al., supra.* See *In re Interest of Jagger L., supra*. The State must prove these facts by clear and convincing evidence. *Id.* Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proven. *Id.*

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Jagger L., supra*. Only one statutory ground

for termination need be proven for parental rights to be terminated. See *In re Interest of Kendra M.*, 283 Neb. 1014, 814 N.W.2d 747 (2012).

Section 43-292(7) provides for termination of parental rights when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." See, also, *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). The Nebraska Supreme Court has held that § 43-292(7) operates mechanically and, unlike other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of the parent. *In re Interest of Aaron D., supra.* As such, parental fitness is not a factor in finding that termination of a person's parental rights is warranted pursuant to § 43-292(7). *In re Interest of Aaron D., supra.* Rather, when termination is based upon a finding that § 43-292(7) applies, parental fitness is addressed in considering the children's best interests. See *In re Interest of Aaron D., supra.*

In the present case, we noted in our prior memorandum opinion that Ray'Cine was first adjudicated to be within the meaning of § 43-247(3)(a) (Cum. Supp. 2006) in October 2007. There is no dispute that Ray'Cine has been in an out-of-home placement continually since that time. At the time the second petition for termination of Sylvester's parental rights was filed, Ray'Cine had been in an out-of-home placement continually for more than 48 months.

We also noted in our prior memorandum opinion that Dejan was placed in the temporary custody of DHHS in February 2009 and was placed in an out-of-home placement in March 2009. There is no dispute that Dejan has been in an out-of-home placement continually since that time. At the time the second petition for termination of Sylvester's parental rights was filed, Dejan had been in an out-of-home placement continually for more than 32 months.

It is clear that a mechanical application of § 43-292(7) demonstrates that the State proved by clear and convincing evidence that both Ray'Cine and Dejan had been in an out-of-home placement for 15 or more of the most recent 22 months. On appeal, Sylvester has not argued that the State failed to adduce clear and convincing evidence of this time. Rather, he argues that the State failed to do enough to assist him, that there were periods of time where he was not afforded sufficient services, and that the 1-year time period during which he was appealing the first termination of his parental rights should not count against him.

We find no merit to Sylvester's assertions that he was not afforded enough services and opportunities and that, somehow, we should overlook the fact that Ray'Cine and Dejan have essentially been wards of the State for their entire lives, well in excess of the statutory time periods set forth in § 43-292(7). As discussed more fully below, the State did offer services to Sylvester and did provide ample opportunity for him to provide an alternative to the children's out-of-home placement during the several years that these children have been involved in the juvenile system. As discussed more fully below, he failed to take advantage of those services and failed to make sufficient progress.

We find that there is no dispute that the State clearly and convincingly proved that the children have been in an out-of-home placement for 15 or more of the most recent 22 months, demonstrating that the statutory ground for termination of parental rights set forth in § 43-292(7) exists. Sylvester's first assignment of error is meritless.

(2) BEST INTERESTS OF CHILDREN

Sylvester next assigns as error that the juvenile court erred in finding that the State had proven that termination of his parental rights was in the best interests of Ray'Cine and Dejan. We disagree. There was clear and convincing evidence to demonstrate that despite the passage of several years, Sylvester has not made significant progress toward reunification and has not demonstrated a desire to do so. The clear and convincing evidence supports the juvenile court's finding that termination of Sylvester's parental rights was in the best interests of the children, and we find no merit to his assertions to the contrary.

It is well established that the juveniles' best interests are a primary consideration in determining whether parental rights should be terminated. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). A parent's interest in the accuracy and justice of the decision to terminate his or her parental rights is a commanding one. *Id.*

Where termination of parental rights is upheld solely under § 43-292(7), an appellate court must be particularly diligent in its de novo review of whether termination is, in fact, in the children's best interests. See, *In re Interest of Aaron D., supra*; *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). Generally, when termination is upheld under other subsections of § 43-292, the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juveniles, as it will show abandonment, neglect, unfitness, or abuse. *In re Interest of Aaron D., supra.* Section 43-292(7) requires no such proof; thus, it is in the context of analyzing the best interests of the juveniles that courts must respect a parent's "commanding" interest in the accuracy and justice of the decision to terminate parental rights. *In re Interest of Aaron D., supra.*

The 15-month condition set forth in § 43-292(7) serves the purpose of providing a reasonable timetable for parents to rehabilitate themselves, but termination based on the ground that a child has been in an out-of-home placement for 15 or more of the most recent 22 months is not in a child's best interests when the record demonstrates that a parent is making efforts toward reunification and has not been given a sufficient opportunity for compliance with a rehabilitation plan. *In re Interest of Aaron D., supra.*

In this case, the mental health practitioner and play therapist testified that, in her opinion, termination of Sylvester's parental rights was in Ray'Cine's best interests. She based her opinion on Sylvester's having not responded to overtures to become involved in Ray'Cine's emotional and social well-being. The family permanency specialist also testified that termination of Sylvester's parental rights was in the best interests of the children. She based her opinion on the length of time the children had been in an out-of-home placement, Sylvester's difficulties with being able to parent the children, Sylvester's refusal to have contact with her, and his failure to complete court-ordered assessments that would have identified needed services to be provided to assist him. She opined that Sylvester "gave up a while ago" concerning this case.

We recognize that the law does not require perfection of a parent; instead, we should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Aaron D., supra*; *In re Interest of Jacob H. et al.*, 20 Neb. App. 680, ___ N.W.2d ___ (2013). In the past, we have reversed the juvenile court's termination of parental rights when the evidence demonstrated that a parent was doing what he or she could to

comply with court orders, was making progress, and had established a strong relationship with the children.

For example, in *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010), we found that there had been insufficient evidence to demonstrate that termination of parental rights was in the best interests of the children where the evidence demonstrated that the mother whose rights had been terminated had complied with every court order, consistently attended visitation with her children, and exhibited appropriate parenting techniques during the visitations, and where the evidence demonstrated a beneficial relationship between the mother and her children. The evidence in that case clearly and convincingly demonstrated that the mother had done everything that was asked of her in the juvenile court's orders, including undergoing evaluations, participating in therapy, completing parenting classes, maintaining safe and adequate housing and a legal source of income, and being involved in the children's therapy. There was evidence of a strong bond between the children and their mother, such that the children's therapist testified that the children would have been "devastated" if the mother's parental rights were terminated. *Id.*

In the present case, the evidence does not paint the same picture. Instead, Sylvester has complied with only some of the juvenile court's orders. Although he has maintained stable housing and a legal source of income, and has participated in visitation, the uncontradicted evidence demonstrates clearly and convincingly that he has chosen to comply only partially with some court orders and has chosen to disregard others altogether.

In dispositional orders entered in August 2010, April 2011, and October 2011, Sylvester was ordered to cooperate with the various support workers. The evidence adduced, however, demonstrated that the support workers consistently had difficulty communicating with Sylvester and had difficulty getting him to respond to their attempts to communicate with him, whether by telephone or by letter. The testimony indicated that Sylvester frequently did not respond to attempts made by support workers to communicate with him and that he often did not return messages left for him.

There was testimony that he did not respond to messages about participation in court-ordered family therapy and about other services the State attempted to provide to him. The evidence adduced at trial indicated that Sylvester would sometimes agree during meetings with support workers or visitations to participate in offered services, but that after the meeting or visitation, the various providers were unable to get ahold of him and he would not follow through.

The family permanency specialist assigned to the case in October 2011 testified that she was never able to get Sylvester to communicate with her. She left numerous messages for Sylvester, including her contact information, but he refused to return any of the messages or communicate with her. She testified that she was told by other support workers that Sylvester had indicated that he did not want to have contact with her.

The October 2011 dispositional order included a requirement that Sylvester participate in family therapy. The family therapy sessions began in September 2011 and continued at the time of the hearing on the second petition to terminate Sylvester's parental rights. The therapist made attempts to contact Sylvester about attending sessions, including several telephone calls and messages and a letter sent to his house, but Sylvester did not respond to any of these contacts. In

January 2012, he showed up, unannounced, at one session. Ray'Cine reacted poorly to his unexpected appearance, and after a few minutes, he elected to leave and never return for any other sessions. The therapist testified that she would have welcomed and encouraged Sylvester to return for other sessions, especially with some notice so that Ray'Cine could be prepared for his attendance, but Sylvester never expressed any interest in further compliance with the court's order or participation in therapy.

Both the August 2010 and the April 2011 dispositional orders included requirements that Sylvester participate in a pretreatment assessment and a parenting assessment. Sylvester refused to comply with these orders and never completed either assessment prior to the February 2012 hearing on the second petition to terminate his parental rights. The support workers assigned to his case made referrals to assist him in completing the assessments, spoke with him about the assessments on a regular basis, and explained to him that the assessments were items the court was requiring in order for Sylvester to work toward reunification with the children. Despite this, Sylvester refused to complete the assessments because, in his opinion, they were not necessary and "he didn't feel he needed to do them." The uncontradicted evidence clearly and convincingly demonstrated that Sylvester's failure to complete these assessments prevented the support workers from determining what additional services could be offered to assist him in working toward reunification.

The evidence adduced in this case also did not demonstrate such a clearly beneficial relationship between Sylvester and the children as did the evidence concerning the parent and children in *In re Interest of Justin H. et al.*, 18 Neb. App. 718, 791 N.W.2d 765 (2010). Here, the evidence demonstrated that throughout the entirety of Ray'Cine's and Dejan's involvement with the juvenile system, Sylvester never progressed beyond supervised visitation of a few hours per week. There was evidence adduced to demonstrate that Ray'Cine had behavioral problems during visitations that actually worsened over time.

Throughout these proceedings, Sylvester has exercised visitation with Ray'Cine and Dejan. His visitation has not, however, been as consistent as it could have been. Once visitation was reestablished after this court's reversal of the first termination of Sylvester's parental rights, he expressed a desire to move slowly with visitation and establishing a relationship with the children. From that point on, his exercise of visitation was described in conflicting ways by the various witnesses, including being characterized as "not consistent" or "fairly consistent." Between November 2010 and March 2011, Sylvester attended approximately only 20 of 55 scheduled visitations. While there were apparently times where he might not have missed any visitations for a couple of months, there were many times where he did miss scheduled visitations.

The record indicates that Sylvester usually provided notice and indicated that his need to miss the visitation was because of illness or medical reasons. The support workers testified that they had no reason to doubt the veracity of Sylvester's excuses for missing scheduled visitations, but he did miss a number of scheduled visitations. There is some indication in the record that Sylvester was involved in an automobile accident and suffered some physical and medical consequences as a result, but the record does not include any detailed or meaningful explanation to demonstrate that it reasonably excused his compliance with the court's orders or his missed visitations.

In addition, although support workers spoke with Sylvester about increasing his time with the children, he declined to take advantage of the offer and expressed a desire to maintain visitation of only a few hours per week "because he had physical therapy and other stuff going on, and he was comfortable with just" the three scheduled visitations per week.

Although there was evidence from the visitation worker that Sylvester had improved his parenting during visitations and that the children had expressed affection for Sylvester, the evidence demonstrated that his discipline remained "hit and miss," he at times did not engage in structured activities with the children, and he continued to have parenting issues that could not sufficiently be addressed because of his refusal to complete the court-ordered parenting assessment. A November 2011 report from the family support and visitation specialist indicated that Sylvester continued to struggle to parent Ray'Cine and Dejan, that he became flustered and discouraged when they behaved poorly, and that there continued to be a lack of a bond between Sylvester and the children.

In addition, the children's foster parent testified that she had invited Sylvester to attend a variety of functions involving Ray'Cine and Dejan, outside of his normal scheduled visitation time. Sylvester was invited to attend school events like an open house and kindergarten roundup, and he was invited to attend athletic functions like swim lessons. He never accepted the invitations or attended any of these events.

Although the law does not require "perfection" of parents, parents must take advantage of the opportunities afforded to work toward reunification. The evidence adduced in this case paints a picture of a parent who took it upon himself to determine which court orders he wanted to comply with and which he did not feel were necessary, who did not take advantage of the efforts being made to assist him in working toward reunification, and who did not take advantage of other opportunities to develop a beneficial relationship with his children.

Where a parent is unable or unwilling to rehabilitate himself within a reasonable time, the best interests of the children require termination of parental rights. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). The Nebraska Supreme Court has previously recognized that children cannot, and should not, be suspended in foster care, nor made to await uncertain parental maturity. *Id.*

In this case, Ray'Cine has been involved in the juvenile system for more than 4 years and Dejan has been involved in the juvenile system for more than 3 years. During that time, Sylvester has been subject to a variety of court orders that have included a variety of requirements designed to assist him in working toward reunification. He has not consistently demonstrated a desire to comply with them or to take the necessary steps to become a parent for Ray'Cine and Dejan, and he has demonstrated something more akin to contentment with weekly visitation, rather than a more permanent reunification.

Sylvester's parental rights were previously terminated, and we reversed that termination. Sylvester was given another opportunity to demonstrate his desire to be reunified with Ray'Cine and Dejan and his intent to do what was necessary for that to happen. Since that second opportunity was given to him, he has specifically disregarded court orders, exercised arguably inconsistent visitation, refused to consistently communicate with the support workers who were attempting to provide services to him, and refused to take advantage of other opportunities to spend time with the children.

Termination of parental rights is permissible in the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code. *In re Interest of Aaron D., supra*. A termination of parental rights is a final and complete severance of the children from the parent and removes the entire bundle of parental rights; therefore, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort. *In re Interest of Jacob H. et al.*, 20 Neb. App. 680, ___ N.W.2d ___ (2013).

In this case, efforts have been made over a period of years to allow Sylvester to make progress toward reunification. He has not done so. Based on the evidence adduced, there is no reason to believe that his communication with support workers, willingness to comply with court orders, or desire to take advantage of opportunities presented to him will change or improve given more time. While we recognize that this is not an egregious case of a parent engaging in particular misconduct or of being entirely uninvolved with his children, Ray'Cine and Dejan have been in foster care for essentially their entire lives, while Sylvester has taken only minimal steps to maintain his parental rights.

We also recognize that the record reflects that, at times, the State arguably could have done even more to assist Sylvester. For example, we note that the family permanency specialist assigned to the case in October 2011 testified that she never had contact with Sylvester. As noted above, much of that lack of contact is attributable to Sylvester's refusal to have contact with her or return her messages. However, she also testified that she never attempted to go to Sylvester's home and that she was never able to adjust her own schedule to attend one of the visitations that were held three times per week. She attributed not going to Sylvester's home, in part, to concerns for her safety--but the record does not reflect any concern by any of the other support workers about Sylvester's being violent or aggressive and there is no other evidence to suggest any safety concern was merited.

Nonetheless, the evidence clearly demonstrates that each of the support workers made efforts to communicate with Sylvester, to offer him services, to encourage him to comply with the court's orders, and to assist him in making progress toward reunification. The fact that even more might arguably have been possible does not diminish that Sylvester failed to take advantage of the opportunities presented and failed to demonstrate sufficient progress to indicate that reunification would be possible.

We conclude that the State adduced sufficient evidence to clearly and convincingly demonstrate that termination of Sylvester's parental rights was in the best interests of Ray'Cine and Dejan. The children have been out of the home for most of their lives--more than 4 years for Ray'Cine and more than 3 years for Dejan. During that time, Sylvester has complied with some court orders but refused to comply with others, indicating that he did not believe they were necessary or important even though they would have helped to identify services that could be provided to assist him in making progress toward reunification. During the entire time the children have been out of the home, Sylvester has never progressed beyond supervised visitation of a few hours per week and has expressly declined opportunities for more interaction with the children. The record does not suggest that Sylvester will ever be in a position to be reunified with the children and parent them. His assertion that there was not sufficient evidence to demonstrate that termination of his parental rights is in their best interests is without merit.

## V. CONCLUSION

We find no merit to Sylvester's assertions of error. There was sufficient evidence to clearly and convincingly demonstrate both a statutory basis for terminating his parental rights and that termination of his parental rights is in the best interests of the children. We affirm.

AFFIRMED.