IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF ARMANI C. & KAMARI G.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF ARMANI C. AND KAMARI G., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

HAILEY C., APPELLANT, AND ANGEL R., APPELLEE.


Filed July 16, 2024.    Nos. A-23-795, A-23-796.


Appeals from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Allison M. Witcofski, of Douglas, Kelly, Ostdiek, Snyder, Ossian and Vogl, P.C., for appellant.

Katy A. Reichert, of Holyoke, Snyder, Longoria, Reichert & Rice, P.C., L.L.O., guardian ad litem.


MOORE, RIEDMANN, and BISHOP, Judges.

RIEDMANN, Judge.

INTRODUCTION

In these consolidated cases, Hailey C. appeals from the order of the county court for Scotts Bluff County, sitting as a juvenile court, that terminated her parental rights to her children, Armani C. and Kamari G. Hailey assigns that the State failed to show that statutory grounds existed to terminate her parental rights, and failed to meet its burden to show that termination was in the best interests of the children. As such, she assigns that the county court erred in terminating her parental rights. Following our review, we find clear and convincing evidence of a statutory basis for termination and that termination was in the best interests of the children. We therefore affirm.

- 1 -

BACKGROUND

*Procedural History.*

Hailey is the mother of Armani, born in September 2018, and Kamari, born in July 2020. Armani and Kamari have different fathers; Armani's father was an enrolled member of the Rosebud Sioux Tribe. As such, the provisions of the Nebraska Indian Child Welfare Act (NICWA), Neb. Rev. Stat. §§ 43-1501 to 43-1517 (Reissue 2016), apply to Armani's case. Neither father, however, is involved in this appeal.

The children were removed from Hailey's care in November 2021 after law enforcement was called to the family home due to allegations of domestic violence between Hailey and Kamari's father. The home was extremely dirty, and methamphetamine and cocaine were found within reach of the children. The children were placed with Armani's paternal grandmother, and they have remained in that placement throughout the case.

When they were removed, the children were residing in Hastings, but their foster placement was in Gering. The children were adjudicated in June 2022. The case was initially staffed by workers from the Hastings office of the Nebraska Department of Health and Human Services (DHHS), but the case was eventually transferred to Scotts Bluff County. In May 2023, the State filed a motion to terminate Hailey's parental rights, alleging that termination was appropriate under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The termination hearing was held on July 24 and 25. The following evidence was adduced.

*Hailey's Case Plan Goals.*

When the children were first removed, Hailey did not see them for approximately 3 weeks, even though DHHS had provided gas vouchers to her. Around this same time, Hailey was in a car accident in Omaha, Nebraska, which concerned DHHS as there were some allegations that at the time Hailey was under the influence of a controlled substance. Prior to the case being transferred to Scotts Bluff County, the family had been offered supervised parenting time, hotel vouchers, gas vouchers, clothing vouchers for the children, and some transportation services. Eventually, Hailey moved to Scotts Bluff. She was criminally charged due to the controlled substances found when law enforcement was called to the home as discussed above, and she was on probation during this case.

A July 2022 court report, which the county court adopted, set goals for Hailey, including abstaining from the use of illegal substances, completing a drug and alcohol evaluation and following the recommendations, participating in drug testing, managing mental health issues through therapy and recommended programming, attending 4 NA meetings a week with verified attendance, participating in visitation with the children, complying with all court orders and recommendations from family team meetings, working with family support on protective factors, relapse plan, routines and consistency, and finding a job and affordable housing for herself and the children. The goals remained unchanged throughout the case.

Hailey received a substance abuse evaluation in April 2022 that recommended inpatient residential treatment, but after spending a week at a facility, Hailey left the program. By October, Hailey had completed intensive outpatient treatment (IOP) and had employment. She was complying with probation, attending certain support groups, and had enrolled in a parenting class.

She had two positive substance tests, one for marijuana, and one for marijuana and alcohol, in September. While Hailey had been participating in visitation with the children, it was inconsistent due to her work schedule, classes, and support groups.

The December 2022 court report reflected that Hailey had rented an apartment in Gering, Nebraska, and was still employed. She was balancing her time between visits, work, and complying with probation. However, she had still been testing positive for THC. Hailey was going to be starting child parent psychotherapy (CPP) with Armani; it had been scheduled to begin earlier but due to illnesses had to be postponed. She had recently been approved for semi-supervised visitation. Armani and Kamari were set to begin play therapy.

Beginning in February 2023, Hailey was allowed to exercise overnight visitation on Fridays and Saturdays. Due to trauma, mental health, and emotional concerns arising from the children's play therapy, which will be discussed in more detail below, by April she was no longer allowed overnight visitation. Hailey had a drug test that came back positive for marijuana in January. While it was noted that Hailey had done well with her case plan by completing IOP, Circle of Security, and moral reconation theory, and continued her visits, she had struggled with other areas. Hailey had not attended four NA meetings a week, had not followed all the recommendations of her drug and alcohol evaluation, and had not attended mental health counseling. At the time, Hailey reported that she was working to begin dual counseling at a facility.

Katelyn Templeton, a DHHS caseworker, began managing the case in Scotts Bluff County in May 2022. Templeton felt that Hailey had made some progress and had done well on visits. But when it involved harder issues like potty-training and eliminating the use of pacifiers, Hailey did not want to discuss the subjects. Templeton also had concerns about Hailey's sobriety over the long term and had concerns about Hailey's willingness to deal with deeper, harder trauma issues. One evaluation stated that Hailey reported her last substance usage was in March 2023, but Hailey testified that the provider had misunderstood, and that her last usage of "hard drugs" was March 23, 2022. Elsewhere in her testimony, Hailey stated that the last time she used THC was when she was placed on probation in September 2022, and she also reported this in an evaluation. Hailey testified that it took from September 2022 until January 2023, her last positive test, for the marijuana to get out of her system; the testing was done via urinalysis.

Hailey did not seek an evaluation or engage in mental health counseling until after the motion for termination of her parental rights was filed in May 2023. She had begun counseling just prior to the termination hearing in July. Hailey's need to engage in mental health counseling was discussed at least every month during family team meetings, but Templeton did not recall if it was even something that Hailey recognized that she wanted help with. Hailey completed an initial diagnostic interview in May, but the mental health evaluation completed in July was the first mental health evaluation, other than a parenting capacity evaluation, in which Hailey participated. Hailey had been participating in substance abuse counseling for part of the case. She did not begin co-occurring therapy until July. She testified that she did not know she needed to do co-occurring counseling until March, when she received results from the parenting evaluation. That parenting evaluation noted that "there are multiple ongoing, long-term concerns about her parental capacity to ensure her children's safety."

Templeton described Hailey's progress as slow, but once there was a discussion of termination, things progressed. Hailey did work on her case plan, completing drug testing,

evaluations, and certain classes, but when it came to meeting Armani and Kamari's emotional needs and their trauma, there had been little progress. Templeton felt that in the beginning, Hailey really wanted to work her case plan, but when all of the trauma came out in CPP and play therapy and Armani revealed situations about Hailey "being unsafe, it was all just hard to hear." Templeton described that Hailey's lack of "progress about the emotional needs [was] hard."

DHHS recommended termination of Hailey's parental rights. This was based on Hailey's failure to make more progress with her co-occurring counseling, CPP, and play therapy. Additionally, Armani had disclosed several things he needed from Hailey, such as her being safe and admitting to him that she was not safe previously. Templeton testified that Hailey was not meeting those needs.

*Play Therapy.*

In February 2023, Lori Rodriquez-Fletcher began providing weekly therapy for Armani and Kamari. Rodriquez-Fletcher utilized play therapy, particularly experiential play, as well as trauma-focused cognitive behavioral therapy, while treating the children. Both children had consistent play themes involving trauma, lack of/need for nurturing, and relationships.

Kamari broke her arm in March 2023 while on an unsupervised visit with Hailey, and it was reported that Armani and Kamari were jumping on the bed and Armani pushed Kamari. Since that incident, Kamari had used themes of medical trauma in her play and would discuss being afraid of doctors. Armani also engaged in play about Kamari's broken arm, discussing things like being afraid of police and sirens, and he referenced that the police did not take anyone to jail, but instead helped with Kamari's arm. Armani said that when Kamari broke her arm, his mother yelled at him which scared him, and he went to hide in the closet.

Armani discussed other trauma events where police were present, as well as domestic violence he witnessed, including a domestic violence incident in which Hailey broke her arm. Rodriquez-Fletcher believed Kamari's broken arm was a bigger trauma trigger for the children than people realized, because it happened at Hailey's home and brought up memories of other domestic incidents and police involvement. She believed it may have reinforced the children's perspective that Hailey's home was not safe, that she did not protect them, and that she was "mean."

Kamari's foster mother reported that when Kamari was first placed with her, Kamari had some sexualized behavior, but this had stopped. However, in an April 2023 therapy session, Kamari engaged in sexualized play. In therapy, and at home, she had consistently been taking the clothes off dolls. Rodriquez-Fletcher had concerns about potential sexual abuse and/or exposure, but when she discussed this with Hailey, Rodriquez-Fletcher did not see the level of concern she would typically expect from a parent whose child may have been harmed.

Armani had intense trauma play that was evident from the initial session. Armani would often play with animals in a dollhouse or put the animals in "cages," and regularly used a larger tiger animal to represent the mom, who was "mean." In one therapy session the mom tiger would not let the smaller animals escape the house, and a snake was on the roof so that if anyone did get out, the snake would bite or choke them. In an April 2023 therapy session, Armani placed the animals in cages, the "mean mom tiger" kept the animals trapped, and Armani stated the animals were "scared," that the mom was "mean," and he also had a doll that was pushed out of a window

and died. According to Rodriquez-Fletcher, unless a death has occurred, death in play can be symbolic of trauma.

Both children indicated that they did not like to go on visits and said that Hailey was "mean" and that they "do not like mommy." In an April 2023 session, both children struggled, with Kamari having a "melt down" because she wanted to go first, and Armani displaying defiance and difficulty regulating his emotions and behaviors. At times, Armani would crawl on the floor and act like a baby, and his speech regressed to the point where Rodriquez-Fletcher could not understand him. Rodriquez-Fletcher had never seen this type of behavior from the children, but their foster mother reported that this behavior was typical after "mommy days." Rodriquez-Fletcher did not usually see the children the day after they had visited Hailey. The foster mother reported the emotional and behavioral dysregulation had increased dramatically in the last month.

Rodriquez-Fletcher noted that visitation notes were, at first glance, written with a positive tone. While she did not disagree that the visitation notes showed visits were "okay" and that there were no major safety concerns, she felt that when compared to reports from other people in the children's lives, the visitation notes did not always align. Rodriquez-Fletcher felt the family support workers were doing well, but were not extensively trained in mental health, attachment, or development.

At the time of the termination hearing, Armani had a shift in his healing and progress in therapy and began playing certain scenarios that involved having a "helper." In one session, Armani created a barrier with Hailey on one side and Armani and Rodriquez-Fletcher on the other side. Initially, Armani had shown a lot of aggressive behavior while Kamari had been more withdrawn. But more recently, Kamari's behavior had shifted to displaying more aggression and anxiety.

Both Armani and Kamari were still using pacifiers, and they were not potty-trained. Rodriquez-Fletcher believed the pacifiers were the children's safe-haven, much like a child would have a stuffed animal or blanket. She also stated that toileting issues were a very common pattern seen in children that had experienced trauma. Both children were afraid of the bathroom, but Rodriquez-Fletcher did not know exactly what happened to cause it.

Hailey testified that the providers told her to just let the children use the pacifiers as it was soothing for them. Rodriquez-Fletcher testified that a visitation note reported that Hailey wanted to take the pacifiers away "cold turkey" and that was her plan. Rodriquez-Fletcher believed it was discussed that it would not be in the children's best interests to suddenly take the pacifiers away, and that they needed to find other ways to do it. Taking the pacifiers away abruptly would cause trauma because they were the children's source of comfort. Rodriquez-Fletcher also testified that Hailey had previously said that potty training was not her priority, and she was not going to do that since her overnight visits were taken away, and that she needed to wait until the children felt more comfortable with her.

Rodriquez-Fletcher noted that it was common for children's emotional and behavioral dysregulation to get worse when they begin to explore their trauma through therapy, but that she specifically used play techniques to allow the children to direct their own treatment. But Armani and Kamari immediately went to trauma play, which indicated that they thought about the trauma often and were not ready to move forward with healing because others were not understanding

what they were communicating or needing. She believed Armani and Kamari were overwhelmed and needed time and patience as they worked through their trauma. Rodriquez-Fletcher diagnosed Armani with posttraumatic stress disorder, unspecified, and parent-child relational problem. She had diagnosed Kamari with unspecified trauma and stressor-related disorder, parent-child relational problem, and while not officially diagnosed yet with posttraumatic stress disorder, Rodriquez-Fletcher believed Kamari met the criteria and would likely adjust her diagnosis to include it.

Rodriquez-Fletcher had met with Hailey three times by the time of the termination hearing, in addition to seeing her at monthly team meetings. She had tried to reach out to Hailey in mid-March 2023, but Hailey did not contact her until Hailey was notified that she would no longer receive unsupervised and overnight visitation. Rodriquez-Fletcher felt that Hailey needed to do individual work to be able to address the children's needs, that while Hailey would make efforts and try, she sometimes did not go about it the right way. Both children had a level of connection to Hailey, wanted her, and loved her, but there was a disorganized style where they did not quite feel safe with her, so they pushed her away. Rodriquez-Fletcher described Hailey as being "detached emotionally" and because she does not have a lot of facial expression, it is confusing to the children because they cannot read her mood.

Rodriquez-Fletcher testified that her biggest frustration was that "Hailey has so much potential and . . . has really held herself back." For example, Rodriquez-Fletcher stated that visitation would be a time for Hailey to tell the children she was sorry if she was mean, but instead she would say that she was not mean and asked the children why they said that, or that she was not mean because she was buying them things or taking them places.

Rodriquez-Fletcher felt that Hailey had not addressed her mental health or her trauma. She testified that Hailey had been a victim of domestic violence and had a lot of trauma related to that, along with other trauma, but that Hailey had not begun to address it. Rodriquez-Fletcher believed that Hailey had a very limited awareness of her own trauma, how the trauma impacted the children, and how her own mental health and substance abuse had affected the children. Rodriquez-Fletcher stated that if a person could not acknowledge his or her own trauma and hurt and did not heal from it, he or she would tend to repeat it. She did not believe that Hailey could help heal the children because she could not acknowledge their trauma if she could not acknowledge her own. Rodriquez-Fletcher believed that while the children did have an attachment to Hailey, it was not a completely secure, healthy attachment. To start healing, the children needed a secure attachment.

*Child Parent Psychotherapy.*

Sarah Bernhardt provided CPP for Hailey and Armani. Her first session with Armani was in January 2023. In the first two sessions, Armani displayed a couple of examples of trauma play, which Bernhardt found significant because children do not usually do that until they established safety. When trauma play is immediately displayed, it is an indication that there is a lot the child wants to say and it is a bit of a cry for help.

Since beginning CPP, Bernhardt has seen progress with Armani, in that he can stay near Hailey longer before moving away, though he still moved away and did sometimes create barriers between them in his play. Hailey had some progress at the end of March through April 2023, but there was some regression in June and July. Bernhardt believed Armani's progress in CPP would

be related to Hailey's progress in her own therapy. She testified that it could take at least 9 to 12 months to really help Hailey address the barriers to meeting Armani's needs.

*Nebraska Indian Child Welfare Act Expert.*

Edison Red Nest, III, a member of the Ogalala Sioux Tribe, testified at the termination hearing. His mother was an enrolled member of the Rosebud Sioux Tribe, so he was also familiar with their cultural characteristics. Red Nest had experience with Native American culture throughout his life, as well as through different trainings. He had previously been qualified as an expert in NICWA cases involving the Ogalala Sioux and Rosebud Sioux Tribes. Without objection, the county court found Red Nest to be an expert NICWA witness.

Red Nest, after reviewing the files, confirmed that he believed that DHHS made active efforts to prevent the breakup of the Indian family. He noted the records reflected that DHHS provided hotel rooms for visits, case management, case plans, SDM assessments, relative placements, siblings were placed together, referrals to community resources, Medicaid, relative notification, monthly foster care case reimbursement payment, NICWA notices, phones calls to the Tribe provided updates, gas vouchers, clothing vouchers, bus passes for certain parties, CPP, Christmas gifts, monthly face-to-face contacts, drug testing referral for certain parties, supervised parenting time, management, birth certificate, and referral for Circle of Security. He did not believe those efforts were successful. Red Nest's opinion was that, based on the way the case had been going, it was more than likely that Armani would face serious emotional or physical damage if left in Hailey's continued custody. He believed there could be some sort of trauma, either physical or emotional, or both.

*Termination Order.*

The county court found the State had shown that termination was appropriate under § 43-292(7). It also found that the State had met its burden with respect to NICWA. The county court noted that Hailey had participated in her case plan in certain areas, but it also stated that Hailey needed to address her own trauma if she was to become a fit parent, and she had not done so. It found that Hailey was unfit, and that it was in the children's best interests to terminate her parental rights. Hailey appeals.

## ASSIGNMENTS OF ERROR

Consolidated and restated, Hailey assigns that the county court erred in finding that (1) a statutory basis to terminate her parental rights had been proven, (2) termination of her parental rights was in the best interests of the children, and (3) she was unfit.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id*.

ANALYSIS

*Nebraska Indian Child Welfare Act.*

Although not assigned as error, because we review cases involving the termination of parental rights de novo, we pause here to review whether the State complied with the requirements of NICWA as it relates to Armani. Armani, through his father, is eligible for membership in the Rosebud Sioux Tribe. As such, the provisions of NICWA apply to him. To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024).

NICWA adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. *In re Interest of Cameron L. & David L., supra.* First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. *Id*. See § 43-1505(4). Second, the State must prove by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. *In re Interest of Cameron L. & David L., supra*. See § 43-1505(6).

The State presented the testimony of Red Nest, a member of the Ogalala Sioux Tribe, and the son of a member of the Rosebud Sioux Tribe. Red Nest had experience with Native American culture. He had previously been qualified as an expert in NICWA cases involving the Ogalala Sioux and Rosebud Sioux Tribes. The county court found Red Nest to be an expert NICWA witness, and this court does likewise.

Though expert testimony on the issue of active efforts is not required, Red Nest, after reviewing the files, confirmed that he believed that DHHS made active efforts to prevent the breakup of the Indian family and that those efforts were unsuccessful. In addition to Red Nest's testimony, there was evidence, recounted more fully above, of the efforts the State took to offer services to help prevent the breakup of the family, which also met the requirement of active efforts.

Second, Red Nest opined it was more than likely that Armani would face serious emotional or physical damage in the form of physical or emotional trauma, if left in Hailey's continued custody. Therefore, the second requirement was also met. We turn now to Hailey's assigned errors.

*Statutory Basis.*

Section 43-292(7) allows for termination when the juvenile has been in out-of-home placement for 15 or more months of the most recent 22 months. This subsection operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault of the parent. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). In other words, if the 15 out of 22 formula is met, § 43-292(7) is met. *In re Interest of Mateo L. et al., supra*. Here, the evidence showed that Armani and Kamari had been in out-of-home placement for approximately 18 months at the time the State filed for termination of Hailey's parental rights. This is sufficient to meet the requirements of § 43-292(7).

Hailey argues the State failed to prove that other subsections of the statute were met. However, the only statutory basis upon which the county court terminated her rights was

§ 43-292(7). Having found clear and convincing evidence that this statutory basis was met, we need not address the other basis upon which the State sought termination. An appellate court will not consider an issue on appeal that the trial court has not decided. *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014).

As noted above, the county court found only one statutory basis for termination, that being that the children were out of the home for 15 of the most recent 22 months. The Nebraska Supreme Court has noted that in cases where termination is sought solely on the basis of § 43-292(7), "proof that termination is nonetheless in a juvenile's best interests will, necessarily, require clear and convincing evidence of circumstances as compelling and pertinent to a child's best interests as those enumerated in the other subsections of § 43-292." *In re Interest of Aaron D.*, 269 Neb. 249, 263, 691 N.W.2d 164, 174 (2005). Although the county court found termination appropriate under § 43-292(7), the State's petition to terminate Hailey's parental rights alleged other statutory bases for termination. As such, there was evidence presented regarding factors related to these other statutory bases, and that evidence clearly and convincingly proves that termination was in the best interests of the children and that Hailey is unfit.

*Best Interests and Parental Unfitness.*

Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). The Due Process Clause of the U.S. Constitution would be offended if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness. See *In re Interest of Denzel D., supra*. As such, we apply a rebuttable presumption that it is in the child's best interests to maintain a relationship with his or her parent. See *id*. That presumption can only be overcome by a showing that the parent is either unfit to perform the duties imposed by the relationship or has forfeited that right. *Id*.

Although the term "unfitness" is not expressly stated in § 43-292, it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. See *In re Interest of Jessalina M.*, 32 Neb. App. 98, 994 N.W.2d 106 (2023). In this context, parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, the performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to the child's well-being. *Id*. The best interests and parental unfitness analyses require separate, fact-intensive inquiries, but each examines essentially the same underlying facts. *Id*.

There was evidence that Hailey had made progress and had participated in her case plan. Her drug tests were negative as of January 2023, she was employed, and she had her own apartment with room for the children. She participated in CPP and in the children's therapy. Hailey had also, by the time of the termination hearing, started to receive individual mental health counseling.

But through CPP and play therapy, it became clear that both Armani and Kamari had experienced trauma, and this was expressed through their emotional and behavioral dysregulation. This dysregulation increased after visits with Hailey. Rodriquez-Fletcher believed that until Hailey addressed her own trauma, she would not be able to help the children with their trauma. Templeton testified that Hailey's need for mental health treatment was discussed monthly, but that she could not recall that it was even something Hailey recognized that she needed help with. Hailey did not

begin co-occurring therapy until July 2023. While Hailey had made some progress, at the time of the termination hearing she still was not fully addressing this issue. Further, these steps were not taken until after the filing of the motion to terminate her parental rights. Hailey has shown an unwillingness to address her own trauma and mental health; this impacts her children and her ability to be a fit parent for them.

Armani and Kamari deserve the permanency necessary to begin to heal from their trauma. It is unclear when Hailey would be ready to provide this. While Hailey loves her children, she has not shown that she is ready and able to take the steps necessary to meet their needs. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). We find the county court did not err in determining that termination of Hailey's parental rights was in the best interests of the children, nor did it err in determining that Hailey was unfit.

## CONCLUSION

We find the State met the requirements of NICWA as it relates to Armani. It presented clear and convincing evidence that the requirements § 43-292(7) were met, that termination was in the children's best interests, and that Hailey was unfit. We affirm the judgment of the county court terminating Hailey's parental rights to Armani and Kamari.

AFFIRMED.